COMMERCIAL DRAPERY CONTRAC-
TORS, INC. and Milford Acquisition
Corp., d/b/a Draperies Plus, Appellants,

v.

UNITED STATES of America,
et al., Appellees.

No. 97–5061.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 17, 1997.

Decided Jan. 16, 1998.

Alan M. Grayson, McLean, VA, argued the cause and filed the briefs for appellants.

Nancy R. Page, Assistant U.S. Attorney, Washington, DC, argued the cause for appellees. With her on the brief were Mary Lou Leary, U.S. Attorney, and R. Craig Law-

rence, Assistant U.S. Attorney. John D. Bates, Assistant U.S. Attorney, entered an appearance.

Before: EDWARDS, Chief Judge, WALD and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

A grand jury returned an indictment against a government contractor—Commercial Drapery Contractors, Inc.—and its president, Jeffrey P. Goldstein, for defrauding the government. The General Services Administration then suspended contracting with Commercial until completion of the criminal proceedings, and terminated an ongoing contract with the company under a contractual provision allowing cancellation "for any reason." GSA also canceled an ongoing contract and suspended future contracting with Milford Acquisition Corporation, d/b/a Draperies Plus, a company Goldstein and his wife owned. The indictment alleged that Milford was involved in the scheme to defraud.

Commercial and Milford brought suit in United States district court, claiming that GSA's cancellation and suspension decisions violated multiple government procurement statutes and regulations, and constituted "de facto debarment" or "blacklisting," thereby depriving them of due process. The district court converted GSA's motion to dismiss into a motion for summary judgment, which it granted in GSA's favor. *See Commercial Drapery Contractors, Inc. v. United States,* 967 F.Supp. 1 (D.D.C.1997). Commercial and Milford appealed the district court's judgment and the court's supposed failure to grant their discovery request before ruling on GSA's motion.

**Facts.** Commercial, a Maryland corporation, sells "window treatments"—draperies, blinds, cubicle curtains and the like. Before his indictment, Jeffrey Goldstein was in complete control of Commercial. He was president and sole stockholder of the corporation when the contracts involved in this case were negotiated. In 1990, Goldstein incorporated Milford. Like Commercial, Milford manufactures draperies and other window treatments for sale to the government and to commercial customers. The indictment alleged that Goldstein owned forty-five percent of Milford's stock, while his wife owned the remainder.

For the past 23 years Commercial has supplied its products to the federal government under a series of "multiple award schedule" contracts negotiated with GSA. Multiple award schedule contracts allow the government to purchase supplies from contractors on an "as needed" basis at a price schedule previously determined through agreement with GSA. After lengthy negotiations, GSA awarded Commercial such a contract in February 1991. The price schedule was based upon cost and pricing data submitted by Commercial during the course of these negotiations. In 1993, GSA modified that schedule to allow Commercial to increase its prices, again relying on the cost and pricing data submitted by Commercial.

The indictment, returned on June 11, 1996, alleged that Commercial and Goldstein had falsified much of the information that Commercial provided to the agency during the course of these contract negotiations. According to the indictment, Commercial: reported significant commercial sales when the real numbers were much smaller; falsified its commercial price lists to indicate that it charged higher prices to its commercial customers than it in fact charged; submitted price lists and invoices inflating the costs of their purchase of fabric and other materials; and failed to disclose that it obtained some of its supplies from Milford at substantially lower prices than those reflected in the cost and pricing data submitted to the agency. The indictment also mentioned that Goldstein failed to disclose that he and his wife owned Milford.

In an effort to forestall the likely consequences of indictment, Commercial submitted a letter to GSA describing changes to its corporate structure that it believed would prevent future fraud. This effort—and others—failed. On July 23, 1996, GSA suspended Commercial and Milford from the receipt of new contracts. Four months later, GSA

exercised a termination clause in Commercial's and Milford's existing contracts.

**■ Jurisdiction.** Before we get to the merits, we must spend a moment on jurisdiction. This court cannot hear claims "founded upon any express or implied contract with the United States ... which are subject to sections 8(g)(1) and 10(a)(1) of the Contract Disputes Act of 1978."[1] 28 U.S.C. § 1346(a)(2). Such matters are exclusively within the jurisdiction of the Court of Federal Claims. *See* 28 U.S.C. § 1346(a)(2); 41 U.S.C. §§ 607(g), 609(a)(1); *see also Ingersoll–Rand Co. v. United States,* 780 F.2d 74, 76–78 (D.C.Cir.1985). Among other things, Commercial and Milford complain about the termination clause in their contracts. That sounds like a claim founded on a contract. But "classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claim, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 968 (D.C.Cir.1982). The basis of Commercial's and Milford's claim is that GSA's repeated attempts to extricate the government from financial dealings with them constituted unlawful "blacklisting." The dispute over the termination clause in their contracts is embedded within this broader claim, and is not an independent cause of action. This is presumably why Milford and Commercial seek only equitable relief, rather than damages for breach of contract. The claim and the type of relief requested thus reveal that this is not "at its essence" a contract action. Accordingly, we have jurisdiction.

**■ Suspension of Commercial's and Milford's contracts.** GSA has the authority to suspend contractors indicted for defrauding the government.[2] *See* 48 C.F.R. § 9.407–1(a), –2(a)(1). The controlling regulation, 48 C.F.R. § 9.407–2(a)(1), provides that the suspending official "may suspend a contractor suspected, upon adequate evidence, of ... [c]ommission of a fraud or a criminal offense in connection with (i) obtaining, (ii) attempting to obtain, or (iii) performing a public contract or subcontract...." Commercial's indictment for the commission of such a criminal offense is sufficient to support its suspension. *See* 48 C.F.R. § 9.407–2(b) ("Indictment ... constitutes adequate evidence for suspension."); *see also Horne Bros. v. Laird,* 463 F.2d 1268, 1271 (D.C.Cir.1972). Counsel admitted as much in his letter to GSA on behalf of Commercial in which he stated that "the indictment alone constitutes adequate evidence for suspension." Milford's suspension was justified by its close affiliation with Commercial. *See* 48 C.F.R. § 9.407–1(c) ("The suspending official may extend the suspension decision to include any affiliates of the contractor....").

Despite these regulations, Commercial and Milford ask us to declare that the agency abused its discretion. They rely on another provision of the Code of Federal Regulations stating that GSA "may, but is not required to, consider remedial measures or mitigating factors" taken by a contractor under threat of suspension. 48 C.F.R. § 9.407–1(b)(2). If the suspected contractor is found to be "pres-

---

1. The Contract Disputes Act applies, *inter alia,* to contracts entered into by an executive agency for the procurement of property. *See* 41 U.S.C. § 602(a).

2. GSA's power to suspend Commercial and Milford from contracting with the government is not, as they contend, limited by the Small Business Act, 15 U.S.C. § 637(b)(7), or the Competition in Contracting Act, 41 U.S.C. § 253b. The Small Business Administration is responsible for certifying the integrity and responsibility of a small business concern *prior* to the award of a government contract, *see* 15 U.S.C. § 637(b)(7). Once such an award is made, GSA can rescind the contract or prevent future contracting based upon evidence of the contractor's misconduct in the course of performance. *See* 48 C.F.R.

§ 9.407–1(a); *see also Electro–Methods, Inc. v. United States,* 728 F.2d 1471, 1476 (Fed.Cir. 1984). The Small Business Administration's regulations acknowledge this distinction. *See* 48 C.F.R. § 19.602–1(a)(2)(ii) (SBA need not be involved in a contractor's suspension). The Competition in Contracting Act requires that government contracts be awarded to "responsible" bidders. From this, Commercial and Milford somehow conclude that once a contractor is found responsible and awarded a contract, the issue of the contractor's responsibility may never be revisited. Nothing in the statute purports to limit GSA's power to suspend or cancel the contract on the basis of new information about a contractor's integrity.

ently responsible" such that it no longer presents a business risk to the government, the agency may choose not to exercise its prerogative to suspend. *See* 48 C.F.R. § 9.407–1(b)(2). The argument is that GSA's suspension was unjustified because Commercial had incorporated safeguards into its corporate structure, ensuring its "present responsibility."

First in a letter to the agency, and then in a face-to-face meeting with agency officials, Commercial listed a number of the "remedial measures" the company had taken in order to prove itself "presently responsible": Goldstein resigned from his position as president of Commercial and executed an "irrevocable proxy" for his shares of Commercial; a new control board had taken over; the company adopted a written "Code of Ethics"; and an "Ombudsman" would be appointed to recognize, investigate and report future violations of the law or of the code.[3]

Donald Suda, the GSA official in charge of making the suspension decision, was not persuaded. In his written response to Commercial, he explained that "the change in management of Commercial is less than meets the eye." Suda noted that Goldstein remained an employee at Commercial, casting doubt on the independence of the new management committee. The management committee consisted of several longtime friends and associates of Goldstein. Goldstein's son, who had replaced him as Commercial's president, headed the committee. The committee had not filled its touted "Ombudsman" position. In response to GSA's inquiry, counsel for Commercial "guessed" that he himself would assume the role.

After Suda informed Commercial and Milford that he was suspending them from future contracting, Commercial wrote another letter proposing more changes and objecting to Suda's skepticism of Commercial's new management structure. Suda considered and rejected these arguments in a five-page letter.

Suda's suspension order is significant for what it did *not* decide. Suda frankly acknowledged that not all the facts were known. Based on the allegations of fraud in the indictment, and Commercial's toothless remedial measures, Suda decided to suspend Commercial and Milford from future contracting. But such suspensions are *temporary* measures, available to the government so that it may protect itself from suspect contractors. Although, as Commercial and Milford correctly observe, the regulations do not require GSA to suspend indicted contractors, the regulations also do not require the agency to give targets of suspension a second chance. We conclude that the suspension decision was supported by substantial evidence and was made in accordance with GSA's regulatory procedures.

■ **Cancellation of Commercial's and Milford's contracts.** Despite their suspension, Commercial and Milford continued to do business with the government during the fall of 1996. Before the indictment came down, both companies had been awarded four-year multiple award schedule contracts under which government agencies could order from them as need for their products arose. As one might have expected, the indictment and suspension prompted GSA to consider terminating these ongoing contracts as well. At first, GSA official Monica Gormley considered asking government agencies to order from other multiple award schedule contractors. Gormley quickly realized, however, that it would be difficult to notify all concerned. In addition, she worried that restricting federal agencies from contracting with these companies would hamper a process the multiple award scheduling system had intended to streamline. In light of these considerations, Gormley decided to exercise a clause present in the contracts. The clause read: "Resultant contracts may be canceled in whole or part by either party upon 30 calendar days written notice."

Gormley acted within her discretion in exercising the cancellation clause. 48 C.F.R. § 9.405–1(a) states that "agencies *may* continue contracts . . . in existence at the time the contractor was . . . suspended" (emphasis added). A decision to terminate an ongoing contract "should be made only after review by agency contracting and technical person-

---

**3.** Milford did not submit materials to the agency   to support its claim of "present responsibility."

nel and by counsel to ensure the propriety of the proposed action." *Id.* Gormley properly reached her decision to terminate under the cancellation clause after conferring with other contracting officials and with counsel.

Although Commercial and Milford did not challenge the thirty-day cancellation clause at the time of contracting, they now insist that the clause is "invalid" because it is a "deviation" from another contract provision—one allowing for "termination for convenience"—and therefore cannot be invoked prior to its publication in the Federal Register. The Code of Federal Regulations defines a "deviation," in relevant part, as a clause that is "inconsistent with the intent, principle, or substance" of the federal acquisition regulations. *See* 48 C.F.R. § 1.401. Commercial and Milford never bother to explain *why* they think the two cancellation clauses are inconsistent with one another; they just say again and again that the two provisions perform different functions. GSA tells us that there is no conflict: the thirty-day notice of cancellation provision permits either party to cancel an entire multiple award schedule contract with the requisite notice, while the "termination for convenience" provision included in most federal contracts permits either party to cancel individual orders. We see no basis for disagreeing with GSA's view.

■ Commercial and Milford also contend that GSA violated its own implementing regulation, 48 C.F.R. § 509.405–1(a)(2), by cancelling their ongoing contracts without considering the five factors listed in that regulation. They are mistaken. The regulation does not apply here, and even if it did it would be of no help to them. The regulation states that "[t]ermination of current contracts *should be considered*" if the contractor presents a "significant risk to the Government in completing a current contract." *See* 48 C.F.R. § 509.405–1(a)(2) (emphasis added). The risk here is a different one: it is not the inability of these companies to complete their contracts that GSA

fears, but rather their inability to do so honestly. The regulation thus does not apply. Even if it did, it would provide no comfort to Commercial or Milford. The regulation's five factors all concern the potential harm to the government of cancelling the contract.[4] The regulation does not curb GSA's discretion to cancel contracts; rather, it *encourages* GSA to exercise its discretion to cancel when the government's interests are put at risk.

**Due Process.** Commercial and Milford object not only to the merits of GSA's decision to suspend them and cancel their current contracts, but also to the method by which the suspension and cancellation occurred. They argue that GSA's actions constituted "blacklisting" or "de facto debarment" in violation of due process.

■ Suspending a contractor is a serious matter. Disqualification from contracting "directs the power and prestige of government" at a single entity, and may cause economic injury. *See Horne Bros.*, 463 F.2d at 1271. An agency may not impose even a temporary suspension without providing the "core requirements" of due process: adequate notice and a meaningful hearing. *See Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 595, 599–602 (D.C.Cir. 1993); *ATL, Inc. v. United States*, 736 F.2d 677, 682–84 (Fed.Cir.1984); *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953, 967–69 (D.C.Cir.1980); *Art– Metal U.S.A., Inc. v. Solomon*, 473 F.Supp. 1, 4 (D.D.C.1978).

■ Commercial and Milford received both notice and an informal hearing, but they are not satisfied. They requested, and were denied, a formal hearing, and this they say violated the Fifth Amendment. To evaluate this contention, we have been instructed to consider the relative strength of three factors: the private interest affected by government action; the risk of erroneous deprivation without the requested safeguard; and

---

4. The five factors are: "(i) Seriousness of the cause for debarment or suspension; (ii) Extent of contract performance; (iii) Potential costs of termination and reprocurement; (iv) Urgency of the requirement and the impact of the delay of re-

procurement; (v) Availability of other safeguards to protect the Government's interest until completion of the contract." 48 C.F.R. § 509.405–1(a)(2).

the government's interest in avoiding additional procedures. *See Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *Reeve*, 982 F.2d at 598; *Old Dominion*, 631 F.2d at 967. Here the factors point against Commercial and Milford. Suda considered their request for a formal hearing, conferred with the Assistant United States Attorney in charge of the criminal case,[5] and concluded that a hearing could compromise the ongoing criminal investigation. While the loss incurred by these companies from being suspended may have been significant, we do not believe a formal hearing would have provided them additional protection significant enough to warrant the risk to the government's interests. We are not the first court to reach the conclusion that suspended contractors are not constitutionally entitled to a formal hearing if providing one would risk impairing an ongoing criminal investigation and prosecution. *See Horne Bros.*, 463 F.2d at 1272; *ATL*, 736 F.2d at 686; *Electro–Methods, Inc. v. United States*, 728 F.2d 1471, 1476 (Fed.Cir.1984); *Transco Sec., Inc. v. Freeman*, 639 F.2d 318, 321–23 (6th Cir.1981); *see also* W. NOEL KEYES, GOVERNMENT CONTRACTS 211 (2d ed.1996).

■■■ **Discovery.** The district court granted GSA's motion for summary judgment based solely on the administrative record, denying the discovery request of Commercial and Milford and refusing to examine affidavits filed by the parties. *See Commercial Drapery*, 967 F.Supp. at 5–6. The suspended companies were not entitled to discovery of the agency's decisionmaking process. Their claims that GSA's suspension and cancellation decisions were arbitrary, capricious, and in violation of federal regulations and statutes are reviewed under the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(A), (B), which limits review to the administrative record, *see Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C.Cir.1981), except when there has been a "strong showing of bad faith or improper behavior" or when the

record is so bare that it prevents effective judicial review. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825–26, 28 L.Ed.2d 136 (1971); *Community for Creative Non–Violence v. Lujan*, 908 F.2d 992, 997–98 (D.C.Cir.1990).

Commercial and Milford have not met their burden of making either showing. *See* FED. R. CIV. P. 56(e). The basis for their claim of "bad faith" rests on a single affidavit written by Stephen Bronstein, the new president of Commercial, alleging that an employee had told him GSA had barred Commercial from participating in a trade show in Germany, and had said bad things about Commercial to its business partners and potential customers. The employee himself refused to submit an affidavit. According to Bronstein, this was because the employee was afraid he would be "blacklisted" by GSA if he did so.

An affidavit like this, consisting entirely of inadmissible hearsay, is not sufficient to defeat summary judgment. *See* FED.R.CIV.P. 56(e); *see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49–50 (1st Cir.1990). In any event, contrary to assertions of the companies' counsel at oral argument, this affidavit was not produced to support a specific discovery request before the district court. As disclosed in counsel's post-argument submissions to this court, the affidavit was filed as an exhibit to Appellants' Reply in Support of Motion for Preliminary Injunction Against Contract Cancellation. Having failed to make a specific discovery request before the district court, the companies cannot now complain that they lack some unspecified set of documents that would support their claims.

■■■ Commercial and Milford say that even if they failed to make the requisite showing of bad faith or improper behavior on the part of the agency, they should at least have been granted discovery to pursue their so-called *Bivens* claim against agency officials Monica Gormley and Donald Suda. This argument goes nowhere. The complaint con-

---

5. Communications between prosecutors and suspending officials are not impermissible, as Commercial and Milford claim; indeed, the governing regulations suggest that suspension officials confer with the Justice Department before making the suspension decision. *See* 48 C.F.R. § 9.407–3(c)(6).

**8**

tains no such claim; damages are not mentioned; and there is no indication that these defendants were being sued in their individual capacities.[6] Counsel for the companies alluded to a *Bivens* claim at the hearing on a temporary injunction. But he never amended the complaint or even moved to do so. As the case stood when the district court decided it, there was no *Bivens* claim and thus no basis for allowing discovery to fortify it.

We have considered the remainder of Commercial's and Milford's claims and find no merit in them.

*Judgment affirmed.*

---

**6.** Although the complaint names Suda and Gormley as defendants, it gives their official address, as required when a person is sued in an official capacity. *See* Rules of the United States District Court for the District of Columbia, Rule 106(e); *see also Barbera v. Smith*, 836 F.2d 96, 99 (2d Cir.1987). In addition, Suda and Gormley were served with copies of the summons and complaint in accordance with Fed.R.Civ P. 4(i), which governs service upon officers of the United States sued in their official capacity. *See Armstrong v. Sears*, 33 F.3d 182, 186–87 (2d Cir. 1994) ("[I]n a *Bivens* case, personal service should be made upon the individual defendant in accordance with Rule 4(e) *instead of* upon that individual as a government officer in accordance with Rule 4(i)(2).").