The FUND FOR ANIMALS
et al., Plaintiffs,

v.

Steven WILLIAMS et al., Defendants.

No. CIV.A. 01–2078(RMU).

United States District Court,
District of Columbia.

Feb. 10, 2003.

Jonathan Russell Lovvorn, Meyer & Glitzenstein, Washington, DC, for plaintiffs.

Mauricia M.M. Baca, Lori Caramanian, U.S. Dept. of Justice, Environment & Nat-

ural Resources Div., Washington, DC, for defendants.

*MEMORANDUM OPINION*

URBINA, District Judge.

DENYING THE PLAINTIFFS' MOTION TO COMPEL THE DEFENDANTS TO FILE A COMPLETE ADMINISTRATIVE RECORD

## I. INTRODUCTION

The dispute before the court can be reduced to one question: who determines what constitutes the "full administrative record" that was "before" the agency at the time of its decision for the purposes of judicial review of an agency decision under the Administrative Procedure Act? In this case, each side claims that privilege for itself. The Fund for Animals, the Biodiversity Legal Foundation, the Utah Environmental Congress, the Humane Society of the United States, and two wildlife enthusiasts (collectively, "the plaintiffs") do not believe that the Fish and Wildlife Service ("the Service") and the Department of the Interior (collectively, "the defendants") have submitted the full administrative record for the defendants' decision to authorize a limited take of Trumpeter swans. They now petition the court to compel the defendants to produce additional materials to the plaintiffs' satisfaction. The defendants counter that they have indeed submitted the full record, and assert that the plaintiffs have not met their burden of proving otherwise. For the reasons that follow, the court denies the plaintiffs' motion to compel the defendants to file a complete administrative record.

## II. BACKGROUND

### A. Factual Background

With a wingspan of more than seven feet, the Trumpeter swan (*Cygnus buccinator*) is the largest native waterfowl in North America, and one of the rarest North American waterfowl species. Administrative R. ("A.R.") 3863, 5044; Am. Compl. at 15; Pls.' Mot. for Summ. J. at 5. At one time the Trumpeter swan inhabited almost every region of the country. A.R. 3695; Am. Compl. at 6; Pls.' Mot. for Summ. J. at 5. By the end of the 19th century, however, overhunting [1]—driven by demand for hats, powder puffs, feather boas, and quills—had reduced their number to the point of near extinction. A.R. 3695, 4076, 5056; Am. Compl. at 15; Pls.' Mot. for Summ. J. at 6. In addition, colonial expansion led to the destruction of the Trumpeter swan's breeding habitat. A.R. 4001, 4076; Pls.' Mot. for Summ. J. at 5. Other major threats to the species include lead poisoning, disease, and starvation during severe winter conditions. A.R. 3621, 5057, 5874–5939; Am. Compl. ¶ 47; Pls.' Mot. for Summ. J. at 7.

Eliminated from 99 percent of its historic range by mid-century, the only remaining indigenous wild breeding Trumpeter swan population in the contiguous United States today consists of a mostly non-migratory population in the Greater Yellowstone area of Idaho, Montana, and Wyoming (the "Tri–State" area). A.R. 5415, 5872, 5876; Am. Compl. ¶¶ 49, 53; Pls.' Mot. for Summ. J. at 6, 9. As of 2000, the Tri–State population consisted of an estimated 426–481 individual birds. A.R. 5607; 5701; Pls.' Mot. for Summ. J. at 9.

In part to protect Trumpeter swans from extinction, the Service began a winter

---

1. The fact that Trumpeter swans fly low along the water course within the hunter's reach, and have a "suicidal habit" of circling overhead when flushed, contributed to overhunting. A.R. 3624, 5056; Pls.' Mot. for Summ. J. at 6.

feeding program for the Tri–State Trumpeter swan flock in the 1930s. Am. Compl. ¶ 61; Defs.' Mot. for Summ. J. at 8. Because the population does not migrate, and therefore is vulnerable to mass starvation during the severe Tri–State winters, concerns grew about the population's future existence. A.R. 4483, 5282, 5532; Am. Compl. ¶ 61; Pls.' Mot. for Summ. J. at 11–12. In 1992, after the severe winter of 1988–89 resulted in the starvation of more than 100 Trumpeter swans, the Service discontinued the feeding program. A.R. 810, 968, 5316–17; Am. Compl. ¶¶ 71, 72. To promote migration of the Tri–State flock to more suitable winter habitats, the Service began to disperse the swans through hazing and translocation programs. A.R. 5316–17; Am. Compl. ¶ 71.

As the displaced Trumpeter swans migrated, however, they began moving into traditional Tundra swan hunting areas in Utah and other states. A.R. 801, 5596; Pls.' Mot. for Summ. J. at 13–14. Tundra swans (*Cygnus columbianus*) are a relatively abundant migratory swan species that is smaller than but closely resembles the Trumpeter swan. A.R. 377, 2649, 5258, 5596; Am. Compl. ¶ 50; Pls.' Mot. for Summ. J. at 13. As a result, some "pioneering" Trumpeter swans that began migrating were mistaken for Tundra swans and killed. A.R. 5897; Am. Compl. ¶¶ 51, 70; Pls.' Mot. for Summ. J. at 14–15.

In 1995, to reconcile Tundra swan hunting interests with Trumpeter swan restoration efforts, the Service authorized an experimental five-year program pursuant to which it established "(1) a limited, but biologically acceptable, quota on the take of *Trumpeter* swans, and (2) modification of the already limited take and restricted seasons on *Tundra* swans to enhance the likelihood that Trumpeter swans would be successful in expanding their winter range, and (3) a program to monitor the effective-ness of this action." A.R. 801; Am. Compl. ¶¶ 72, 73; Pls.' Mot. for Summ. J. at 15–16.

Based on its experience with the experimental program, in March 2000 the Service published a draft Environmental Assessment ("EA") indicating its plan to establish a modified version of the experimental program and to cease the Service's ongoing translocation efforts. A.R. 957–84; Am. Compl. ¶ 83, 87; Pls.' Mot. for Summ. J. at 17. Despite some criticism, in July 2000 the Service published a final EA ("2000 EA") establishing a permanent program in Montana and Nevada, and a three-year experimental program in Utah. A.R. 2622–54; *e.g.*, A.R. 1043–44, 1064–65, 1108, 1169, 1185–1203; Am. Compl. ¶¶ 90–104; Pls.' Mot. for Summ. J. at 18–24. The final EA was followed by a Finding of No Significant Impact ("2000 FONSI") concluding that the program was not a major federal action that would significantly affect the quality of the human environment within the meaning of the National Environmental Policy Act ("NEPA"), and therefore did not require the preparation of an environmental impact statement ("EIS"). A.R. 2619; Am. Compl. ¶ 113; Pls.' Mot. for Summ. J. at 23–24.

Based on these events, the plaintiffs took two separate but related actions. First, in October 2000, several of the plaintiffs filed suit challenging the Service's final decision. Am. Compl. ¶ 131; Pls.' Mot. for Summ. J. at 26; Defs.' Mot. for Summ. J. at 11. After negotiations, the plaintiffs agreed to dismiss their lawsuit and the Service agreed to prepare a new NEPA analysis to address unresolved biological and legal issues associated with the swan management. Am. Compl. ¶ 132; Pls.' Mot. for Summ. J. at 26; Defs.' Mot. for Summ. J. at 11. Accordingly, in April 2001, the Service issued a revised draft

EA. A.R. 1–30; Pls.' Mot. for Summ. J. at 26. After a period for public comment, the Service issued its final EA ("2001 EA") on June 15, 2001. A.R. 364–419; *e.g.,* A.R. 116–357, 550–61, 3513–16; Am. Compl. ¶ 133; Pls.' Mot. for Summ. J. at 28. The Service issued a Finding of No Significant Impact ("2001 FONSI") that again concluded that the proposal would not significantly affect the quality of the human environment within the meaning of NEPA, and therefore did not require the preparation of an EIS. A.R. 358–63; Am. Compl. ¶¶ 135–36; Pls.' Mot. for Summ. J. at 28–29. In September 2001, the Service incorporated its decision into its annual hunting frameworks. A.R. 576–578q; Am. Compl. ¶ 142; Pls.' Mot. for Summ. J. at 31.

The second action taken by the plaintiffs occurred in August 2000, when two of the plaintiffs ("the ESA plaintiffs") petitioned the Service to list on both an emergency and a non-emergency basis the Tri–State Trumpeter swan population as "endangered" or "threatened" under the Endangered Species Act ("ESA"). A.R. 5865–5961; Am. Compl. ¶ 118; Pls.' Mot. for Summ. J. at 24. On September 22, 2000, the Service responded with a letter concluding that emergency listing was not warranted, and indicating that the Service "would endeavor to process a finding on [the non-emergency listing] petition as quickly as possible." A.R. 5962–63; Am. Compl. ¶ 120; Pls.' Mot. for Summ. J. at 25. On February 5, 2001, the ESA plaintiffs gave the defendants notice of their intent to sue based on the defendants' failure under ESA to issue, within 90 days of the listing petition, a finding as to whether the petition indicated that action may be warranted. A.R. 6043–45; Am. Compl. ¶ 126; Pls.' Mot. for Summ. J. at 25. On April 4, 2001, the Service replied, stating that under the ESA, the agency's

finding was to be made within 90 days "to the maximum extent practicable" and concluding that it was "not practicable for [the Service] to address [the] petition at this time." A.R. 6046; Am. Compl. ¶ 127; Pls.' Mot. for Summ. J. at 25. On September 6, 2001, the ESA plaintiffs notified the Service that under the ESA, it also had failed to issue its determination on the listing of the Trumpeter swan within 12 months of the initial petition. Am. Compl. ¶ 130; Pls.' Mot. for Summ. J. at 25. On January 28, 2003, the Service published its 90–day finding in the Federal Register. Notice of Submission of Pet. Finding at 1.

In this action, the plaintiffs charge that by failing to issue the 90–day finding and 12–month determination regarding the Trumpeter swan listing petition, by omitting to prepare an environmental impact statement for the Trumpeter swan take, and by authorizing the Trumpeter swan take after balancing various considerations, the defendants have violated the procedural and substantive requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.;* the ESA, 16 U.S.C. § 1531 *et seq.;* the NEPA, 42 U.S.C. § 4321 *et seq.;* and the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703 *et seq.* Am. Compl. ¶¶ 143–52. In response, the defendants deny the plaintiffs' allegations and contend that they have met their procedural and substantive obligations under the various acts. Answer to Am. Compl.; Defs.' Mot. for Summ. J. at 1–2.

## B. Procedural History

On October 3, 2001, the plaintiffs filed their initial complaint. In December 2001, the defendants filed their answer. Approximately five weeks later, the defendants submitted the administrative record.[2] At the initial status conference on March 5, 2002, this court granted the

---

**2.** On May 15, 2002, the defendants filed a

supplement to the administrative record con-

plaintiffs leave to file an amended complaint. The court also set a schedule directing the parties to file dispositive motions by April 15, 2002, with oppositions, cross-motions, and replies due thereafter.

Subsequently, the plaintiffs filed an amended complaint, and the defendants filed an answer thereto. On April 15, 2002, however, the case took an unanticipated turn when the plaintiffs filed both the expected motion for summary judgment and a motion to compel the defendants to file a complete administrative record.[3] Meanwhile, on May 15, 2002 the defendants filed their own motion for summary judgment.[4]

The court now turns to the plaintiffs' motion to compel.

## III. ANALYSIS

### A. The Court Denies the Plaintiff's Motion to Compel Defendants to File a Complete Administrative Record

#### 1. Legal Standard for a Full Administrative Record Under Section 706 of the APA

■ Section 706 of the APA directs a court evaluating an agency action to "re-view the whole record or those parts of it cited by a party." 5 U.S.C. § 706; *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C.Cir.1992); *Natural Res. Def. Council, Inc. v. Train*, 519 F.2d 287, 291 (D.C.Cir.1975). The court's review must "be based on the full administrative record that was before the [agency] at the time [it] made [its] decision." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C.Cir.2001).

■ Because the court's review is confined to the administrative record at the time of the agency's decision, it may not include "some new record made initially in the reviewing court."[5] *Ctr. for Auto Safety*, 956 F.2d at 314 (citing *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)); *Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C.Cir.1991). To ensure fair review of an agency action, therefore, the court "should have before it neither more

sisting of four documents inadvertently omitted from the record and one document intended to replace an already included but illegible document. Notice of Filing of Supplements to Administrative R. at 1.

3. By filing the motion to compel without leave from the court, the plaintiffs disregarded the directives in the court's March 5, 2002 Initial Scheduling and Procedures Order. By filing the motion to compel on the same day as their motion for summary judgment, the plaintiffs placed the issue of the administrative record—on which the parties based their dispositive motions—before the court after the parties' dispositive motions were well underway.

4. In addition, on October 10, 2002, the plaintiffs filed an additional declaration. On No-vember 6, 2002, the defendants moved this court to strike the plaintiffs' declaration, or, in the alternative, to permit the defendants to supplement the record with their own declaration. The court will address the additional declarations separately.

5. "The rationale for this rule derives from a commonsense understanding of the court's functional role in the administrative state[:] 'Were courts cavalierly to supplement the record, they would be tempted to second-guess agency decisions in the belief that they were better informed than the administrators empowered by Congress and appointed by the President.'" *Amfac Resorts, L.L.C. v. Dep't of Interior*, 143 F.Supp.2d 7, 11 (D.D.C.2001) (quoting *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 751 F.2d 1287, 1325–26 (D.C.Cir.1984)).

nor less information than did the agency when it made its decision." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C.Cir.1997) (citing *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C.Cir.1984)). As our court of appeals put it, for a court "to review *less* than the full administrative record might allow a party to withhold evidence unfavorable to its case," while "to review *more* than the information before the [agency] at the time [of its] decision risks our requiring administrators to be prescient or allowing them to take advantage of post hoc rationalizations." *Boswell*, 749 F.2d at 792 (emphasis added).

■ To ensure that the administrative record contains "neither more nor less" information than was before the agency, courts in this circuit have directed agencies to collect those materials "that were compiled by the agency that were before the agency at the time the decision was made." *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C.Cir.1996); *Common Sense Salmon Recovery v. Evans*, 217 F.Supp.2d 17, 20 (D.D.C.2002). More specifically, the record must include all documents and materials that the agency "directly or indirectly considered." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir.1993); *Amfac Resorts, L.L.C. v. Dep't of Interior*, 143 F.Supp.2d 7, 12 (D.D.C. 2001); *Novartis Pharms. v. Shalala*, 2000 WL 1769589, at *2 (D.D.C. Nov.27, 2000); *Alaska Excursion Cruises v. United States*, 603 F.Supp. 541, 550 (D.D.C.1984); *see also Pers. Watercraft Indus. Ass'n v. Dep't of Commerce*, 48 F.3d 540, 546 n. 4 (D.C.Cir.1995) (noting with approval that the "whole record" contained all materials "pertaining to the [challenged] regulation").

■ The agency may not skew the record in its favor by excluding pertinent but unfavorable information. *Envtl. Def. Fund v. Blum*, 458 F.Supp. 650, 661 (D.D.C.1978). Nor may the agency exclude information on the grounds that it did not "rely" on the excluded information in its final decision. *Ad Hoc Metals Coalition v. Whitman*, 227 F.Supp.2d 134, 139 (D.D.C.2002); *Amfac Resorts*, 143 F.Supp.2d at 12. On the other hand, an agency may exclude arguably relevant information that is not contained in the agency's files but that may be available from third parties. *Blum*, 458 F.Supp. at 661 n. 4. In addition, an agency generally may exclude material that reflects internal deliberations. *Amfac Resorts*, 143 F.Supp.2d at 13 (noting that deliberative intra-agency records ordinarily are privileged); *Seabulk Transmarine I, Inc. v. Dole*, 645 F.Supp. 196, 201 (D.D.C.1986) (same).

■ Although an agency may not unilaterally determine what constitutes the administrative record, the agency enjoys a presumption that it properly designated the administrative record absent clear evidence to the contrary. *Bar MK Ranches*, 994 F.2d at 739–40 (stating that the administrative record enjoys the same presumption of regularity afforded to other established administrative procedures); *Amfac Resorts*, 143 F.Supp.2d at 12 (noting the "standard presumption" that the agency designated the administrative record properly); *Zeneca Inc. v. Shalala*, 1999 WL 728104, at *3 (D.Md. Aug.11, 1999) (observing that the administrative record enjoys a presumption of regularity); *see also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (stating that "[t]he task of the reviewing court is to apply the appropriate APA standard of review ... based on *the record the agency presents* to the reviewing court") (emphasis added); *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 751 F.2d 1287, 1324 (D.C.Cir.1984) (noting that "[i]n discharg-

ing their obligation to monitor agency action, courts review a record *compiled by the agency* ").

### 2. The Court Presumes That the Agency Has Properly Designated the Administrative Record

Each party vigorously argues its case. The plaintiffs argue that the Service refused to include in the record "over 300 agency documents"[6] based on what the plaintiffs believe are "self-serving" and "blanket" assertions that the materials either were not considered by the decision-maker or are not substantively relevant to the decision. Mot. to Compel at 3–4; Reply at 7. Citing several of this circuit's decisions, the plaintiffs stress repeatedly that the court must review the challenged agency action based on the "full administrative record before an agency at the time of its decision." *Id.* at 6. In their view, accepting the administrative record submitted by the defendants would be tantamount to eliminating meaningful judicial review and authorizing agencies to "manipulate and subvert the entire judicial process by picking and choosing which materials support their positions, and concealing those materials—although indisputably 'before' the agency at the time of decision—that may cast doubt on their actions." *Id.* at 6–7. Accordingly, the plaintiffs ask the court to direct the defendants to file a "complete" administrative record. *Id.* at 1.

In response, the defendants charge the plaintiffs with attempting to "defin[e] for the agency what the plaintiffs believe constitutes the record." Opp'n at 1. Citing many of the same cases to which the plaintiffs refer, the defendants agree that the court must review the "whole record," de-

fined as "neither more nor less information" than was "before" the agency. *Id.* at 3–4. They state that the administrative record as submitted consists of the documents that were before the decision-maker in making the decision. *Id.* at 6. Rejecting the plaintiffs' contention that they are attempting to conceal unfavorable documents, the defendants assert that they declined to supplement the record with the additional documents identified by the plaintiffs because those documents were not considered by the decision-maker. *Id.* at 2, 6. Finally, the defendants note that while narrow exceptions to the rule against extra-record review do exist, those exceptions do not apply here because the plaintiffs have not demonstrated that the agency acted in bad faith or that the record is so bare as to prevent effective judicial review. *Id.* at 4–6. On these grounds, the defendants urge the court to deny the plaintiffs' motion to compel. *Id.* at 1–2, 7.

Both parties agree that the court's review must "be based on the full administrative record that was before the [agency] at the time [it] made [its] decision," and that the court "should have before it neither more nor less information than did the agency when it made its decision." *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814; *Am. Bioscience*, 243 F.3d at 582; *IMS*, 129 F.3d at 623 (citing *Boswell*, 749 F.2d at 792). The question left for the court is straightforward: who determines what constitutes the "full" administrative record that was "before" the agency?

 Common sense and precedent dictate that at the outset, the answer must be the agency. *Bar MK Ranches*, 994 F.2d at 740; *Amfac Resorts*, 143 F.Supp.2d at 12; *Zeneca*, 1999 WL 728104,

---

**6.** The 300 documents are not specifically identified, but apparently include certain documents that the defendants previously re-

leased to the plaintiffs pursuant to the plaintiffs' Freedom of Information Act (FOIA) requests. Mot. to Compel at 3–4.

at *3. It is the agency that did the "considering," and that therefore is in a position to indicate initially which of the materials were "before" it—namely, were "directly or indirectly considered." *Id.* If it were otherwise, non-agency parties would be free to define the administrative record based on the materials they believe the agency must (or should) have considered, leaving to the court the unenviable task of sorting through a tangle of competing "records" in an attempt to divine which materials were considered. "Judges are not historians charged with isolating the 'true' basis for an agency's decision when its ostensible justification proves unconvincing." *San Luis,* 751 F.2d at 1325–26. Hence the presumption that the agency properly designated the administrative record. *Bar MK Ranches,* 994 F.2d at 740; *Amfac Resorts,* 143 F.Supp.2d at 12; *Zeneca,* 1999 WL 728104, at *3.

 In this case, the defendants have submitted an administrative record consisting of 14 volumes containing more than 6,000 pages. Notice of Filing A.R. Accompanying this record is a sworn declaration from the chief of the Service's Division of Migratory Bird Management certifying that the documents constitute the administrative record pertaining to the agency's decision. *Id.* at *3. In response to the plaintiffs' motion, the defendants state flatly that the record "consists of the documents 'before' the decision maker in making the decision; that is, all the documents that the decision maker considered in making the decision, directly and indirectly, both for and against the decision." Opp'n at 6. Their statement is clear and unequivocal. *Id.* The court therefore presumes that the administrative record was properly designated.[7] *Bar MK Ranches,* 994 F.2d at 740; *Amfac Resorts,* 143 F.Supp.2d at 12; *Zeneca,* 1999 WL 728104, at *3.

 Of course the agency does not always have the last word. The "presumption of administrative regularity" is just that—a presumption—and may be overcome. *Bar MK Ranches,* 994 F.2d at 740. For example, "when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review," the court may consider requests to supplement the record with extra-record materi-

---

7. The plaintiffs caution that accepting the defendants' assurances would render judicial review meaningless. Mot. to Compel at 6–7; Reply at 1–2, 5–6. They believe that the defendants are playing a word game, using the word "consider" in its narrowest sense and ignoring what the plaintiffs believe is the broad mandate of the word "before." Mot. to Compel at 7; Reply at 5–6. To avoid this alleged ruse, they urge the court to direct the defendants to include material that "unquestionably," "clearly," and "indisputably" was "before" the agency at the time of the decision. Mot. to Compel at 5, 7; Reply at 4. Although convincingly argued, the plaintiffs' arguments are flawed. First, as noted, the defendants's record enjoys a presumption only. If the record prevents effective judicial review, the presumption disappears. *Commercial Drapery Contractors v. United States,* 133 F.3d 1, 7 (D.C.Cir.1998) (citing *Overton Park,* 401 U.S. at 420, 91 S.Ct. 814). Second, adopting the other extreme by interpreting the word "before" so broadly as to encompass any potentially relevant document existing within the agency or in the hands of a third party would render judicial review meaningless. *E.g., Kent County v. Envtl. Prot. Agency,* 963 F.2d 391, 396 (D.C.Cir.1992) (concluding that the Environmental Protection Agency need not "find *all* documents discussing filtration located in *any* office" of the agency) (emphasis in original); *Blum,* 458 F.Supp. at 661 n. 4 (stating that an agency may exclude relevant information available from third parties). Finally, by insisting that the disputed materials "unquestionably," "clearly," and "indisputably" were before the agency, the plaintiffs run the risk of falling into the same "self-serving analysis" trap of which they accuse the defendants. Mot. to Compel at 5, 7; Reply at 4.

als.[8] *Commercial Drapery Contractors v. United States*, 133 F.3d 1, 7 (D.C.Cir.1998) (citing *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814) (internal quotations omitted); *see also Beach Communications v. Fed. Communications Comm'n*, 959 F.2d 975, 987 (D.C.Cir.1992) (same); *Cmty. for Creative Non–Violence v. Lujan*, 908 F.2d 992, 997 (D.C.Cir.1990) (same). Such exceptions to the general prohibition against extra-record review are narrowly defined, however. *Commercial Drapery*, 133 F.3d at 7; *Amfac Resorts*, 143 F.Supp.2d at 11; *Sociedad Anonima Viña Santa Rita v. Dep't of Treasury*, 193 F.Supp.2d 6, 18 n. 11 (D.D.C.2001). Moreover, those challenging the record must make a "strong showing" that the exception applies. *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814; *Commercial Drapery*, 133 F.3d at 7; *Cmty. for Creative Non–Violence*, 908 F.2d at 997.

 Yet the plaintiffs here expressly disavow any intent to supplement the record, saying instead that they "seek[ ] only to ensure that *all* of the 'evidence' that *was* before the agency, and therefore [is] part of the record, is actually disclosed to the Court." Reply at 7 (emphasis in original). But that statement ignores the fact that the record is presumed properly designated. *Bar MK Ranches*, 994 F.2d at 740; *Amfac Resorts*, 143 F.Supp.2d at 12; *Zeneca*, 1999 WL 728104, at *3. If, once the agency has designated the record, the plaintiffs believe that the defendants have excluded documents in bad faith, they should petition the court to supplement the record, identifying the applicable exception.[9] *E.g., Sociedad Anonima*, 193 F.Supp.2d at 18 n. 11 (refusing to supplement the record when plaintiff "only informed the Court that exceptions to the general rule of limitation exist" and did not "indicate[ ] which exception might apply"). Accordingly, the court will abide by the general prohibition against extra-record review.

## IV. CONCLUSION

For the foregoing reasons, the court denies the plaintiffs' motion to compel the defendants to file a complete administrative record. An order consistent with this Memorandum Opinion is separately and

---

**8.** In dicta, our court of appeals has suggested that there may be as many as eight exceptions to the general rule limiting judicial review to the administrative record. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989).

**9.** In fact, the cases cited by the plaintiffs involve instances in which the plaintiff did exactly that: sought to supplement the record with clearly identified documents by making the requisite showing that an exception to the general rule against extra-record review applied. *E.g., Public Citizen v. Heckler*, 653 F.Supp. 1229, 1237 (D.D.C.1986) (agreeing to the plaintiff's request to supplement the record with several documents after reviewing each document and finding that the plaintiff had made a prima-facie showing of pretext on the part of the department); *Kent County*, 963 F.2d at 396 (acceding to the plaintiff's request to supplement the record with three docu-ments after considering each document and concluding that the plaintiff had made a prima facie showing that the agency negligently excluded them from the record); *Carlton v. Babbitt*, 26 F.Supp.2d 102, 106–07 (D.D.C. 1998) (authorizing, at the plaintiffs' request, supplementation of the record with 25 documents after reviewing each document and determining that the plaintiffs had established the limited circumstances justifying departure from the record). Only one case cited by the plaintiffs involved remand, and in that case "nothing purporting to be the complete administrative record was submitted by either party." *Boswell*, 749 F.2d at 792; *see also Biodiversity Legal Found. v. Norton*, 180 F.Supp.2d 7, 11 (D.D.C.2001) (granting motion to compel production of administrative record after defendants claimed that no administrative record existed).

contemporaneously issued this 10 day of February, 2003.