# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 8, 2005      Decided November 4, 2005

No. 03-5077

THE FUND FOR ANIMALS, INC., ET AL.,
APPELLANTS

v.

MATTHEW J. HOGAN, ACTING DIRECTOR, UNITED STATES
FISH AND WILDLIFE SERVICE, ET AL.,
APPELLEES

———

Consolidated with
04-5077

———

Appeals from the United States District Court
for the District of Columbia
(No. 01cv02078)

———

*Jonathan R. Lovvorn* argued the cause for appellants. With him on the briefs was *Eric R. Glitzenstein.*

*R. Justin Smith*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Andrew C. Mergen* and *John A. Bryson*, Attorneys. *David C.*

*Shilton* and *Greer S. Goldman*, Attorneys, entered appearances.

Before: GINSBURG, *Chief Judge*, and TATEL and BROWN, *Circuit Judges.*

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*:  The Fund for Animals petitioned the U.S. Fish and Wildlife Service to list as endangered or threatened the trumpeter swans inhabiting Wyoming, Montana, and Idaho.  The Service denied the petition and thereafter authorized a limited "take" of trumpeter swans incidental to the 2001 and 2002 hunting seasons for tundra swans in Utah and Nevada.  The Fund sued the Service, claiming these decisions variously violated the Endangered Species Act (ESA), the Adminstrative Procedure Act (APA), the National Environmental Policy Act (NEPA), and the Migratory Bird Treaty Act (MBTA).  The district court rejected the Fund's claims, *see Fund for Animals v. Williams*, 311 F. Supp. 2d 1 (D.D.C. 2004) (ESA claim); *Fund for Animals v. Williams*, 246 F. Supp. 2d 27 (D.D.C. 2003) (NEPA and MBTA claims); *Fund for Animals v. Williams*, 245 F. Supp. 2d 49 (D.D.C. 2003) (APA claim), and the Fund now appeals.

The Service contends all the Fund's claims are now moot and we agree.  We therefore affirm the district court's order dismissing as moot the Fund's claim under the ESA, and we dismiss as moot the Fund's claims under the APA, the NEPA, and the MBTA.  Finally, we vacate the orders under review pursuant to *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950).

## I. Background

The trumpeter swan is the world's largest waterfowl. In the 19th century hunters nearly eliminated the trumpeter swan population in the United States but, pursuant to a treaty between the United States and Canada, the swans have been protected for nearly 80 years. *See* Convention for the Protection of Migratory Birds, U.S.-Gr. Brit. (acting for Canada), Aug. 16, 1916, 39 stat. 1702, 1702 (1916) (bilateral treaty generally prohibiting the hunting of "*Anatidae*," the family to which the trumpeter swan belongs); 16 U.S.C. §§ 703-712 (implementing the treaty). For the purpose of managing trumpeter swans in the United States, the Fish and Wildlife Service divides them into "Pacific Coast," "Rocky Mountain," and "Interior" populations. In 2000 there were an estimated 3,975 trumpeter swans in the Rocky Mountain population, of which fewer than 400 inhabited the Greater Yellowstone "tri-state area" of Wyoming, Montana, and Idaho.

Until recently, the tri-state trumpeter swans were largely nonmigratory. In 1992, however, after one particularly harsh winter caused a significant number of deaths, the Service began facilitating their seasonal migration to warmer climes via the Pacific Flyway. Unfortunately, however, trumpeter swans migrating through the Pacific Flyway are easily mistaken for tundra swans, a physically similar but vastly more populous species. Because the hunting of tundra swans is legal in several of the States in the Pacific Flyway, the Service anticipated that each year hunters of tundra swans would accidentally kill a certain number of trumpeter swans.

In 1995 the Service launched a five-year experiment with the aim of fostering migration by trumpeter swans while

simultaneously reducing the risk posed by hunters: Hunting trumpeter swans would remain illegal, but the Service would accept a certain "take," or number of accidental deaths, among trumpeter swans in Utah and Nevada; if and when the specified number of trumpeter swans was killed, the Service and the State would terminate the hunting of tundra swans for that season.

A. The Fund's Listing Petition

Any "interested person" may petition the Secretary of the Interior to list a "species" as endangered or threatened. 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14; *see also* 16 U.S.C. § 1532(16) ("species" may be a "distinct population segment"). "To the maximum extent practicable, within 90 days after receiving [a] petition," the Service must "make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(b)(1). If the Service concludes in its 90-day finding that the action requested in the petition may be warranted, then it must "promptly commence a review of the status of the species concerned." 16 U.S.C. § 1533(b)(3)(A). Separately the ESA authorizes the Secretary immediately to list a species facing "any emergency posing a significant risk to the well-being of [that] species." 16 U.S.C. § 1533(b)(7).

In August 2000 the Fund petitioned the Service to list, on an emergency and alternatively on a non-emergency basis, the tri-state portion of the Rocky Mountain population as endangered or threatened. *See* The Biodiversity Legal Foundation & The Fund for Animals, "Petition for a Rule to List the Greater Yellowstone (Tri-state) Breeding Population of the Trumpeter Swan (*Cygnus buccinator*) as Threatened or Endangered" (Aug.

22, 2000). In September the Service replied in a two-page letter stating, "The birds included in [the Fund's] petition are not recognized by the Service as a population," and adding that the Service did not "have listing funds currently available to initiate work on a 90-day finding."

The Fund then sued the Service in district court, claiming the letter did not adequately explain why the Service was denying the Fund's request for an emergency listing of the tri-state population and seeking an order requiring the Service to fulfill the 90-day finding requirement of the ESA. Finding the letter provided no "explanation as to why the Service does not recognize the Tri-State swans as a population separate from the [Rocky Mountain] swans," 246 F. Supp. 2d at 36, the district court entered a summary judgment for the Fund, remanding the matter to the Service for elucidation.

In January 2003 the Service finally published the requisite 90-day finding in which it detailed why the tri-state trumpeter swans were not a distinct population segment apart from the Rocky Mountain population. First, the Service determined that the tri-state swans were not "markedly separated from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors." 68 Fed. Reg. 4221, 4223-25 (Jan. 28, 2003). Second, it found they were not "delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status or regulatory mechanisms exist that are significant with regard to conservation of the taxon." *Id.* at 4223, 4225-26. The tri-state trumpeter swans were therefore part of the Rocky Mountain population, which had grown on average by 4.8% per year from 1968 to 2000 and were neither endangered nor threatened. *See id.* at 4228. The district court,

noting that the belated finding had provided "a coherent statement of reasons for the Service's conclusion that the Tri-State Trumpeter swans are not a distinct population segment," 311 F. Supp. 2d at 8, granted the Service's motion to amend the judgment and to dismiss as moot the Fund's claim under the ESA.

B. The 2001 Environmental Assessment

Deeming its experimental migration program of 1995 to 2000 a success, the Service decided to incorporate the program into the regulations it issues each year to govern the hunting of migratory birds. In 2001, therefore, the Service did an environmental assessment (EA), *see* 40 C.F.R. §§ 1501.4(b)-(c), 1508.9, "to establish regulatory options and management direction for Trumpeter and Tundra swans based on past experience with the authorization of a limited take of Trumpeter swans in the Pacific Flyway." U.S. Fish and Wildlife Service, Proposal to Establish Operational/Experimental General Swan Hunting Seasons in the Pacific Flyway 3 (June 15, 2001). Although the hunting of trumpeter swans remained illegal, the 2001 EA allowed for an accidental take of up to 15 birds -- five in Nevada and ten in Utah. As in the experimental program, if and when a quota was reached the Service and the relevant State were to terminate the hunting season for tundra swans. The Service also issued a Finding of No Significant Impact (FONSI), *see* 40 C.F.R. § 1501.4(e), and therefore did not develop a full-blown environmental impact statement (EIS) for its proposal. The Service went on to incorporate the 2001 EA into its annual migratory bird hunting framework regulations for 2001, *see* 66 Fed. Reg. 49,478, 49,482-485 (Sept. 27), and again for 2002, 67 Fed. Reg. 59,110, 59,114-115 (Sept. 19).

Meanwhile, back in district court the Fund, referring to the 2001 EA, alleged the Service had "decid[ed] to establish a permanent hunting season for Trumpeter swans," in violation of various statutes and treaties. First, the Fund claimed the Service had violated § 706 of the APA by failing to provide the court with the "whole record" upon which it had based the 2001 EA. The district court denied the Fund's motion to compel because the Service had submitted "14 volumes containing more than 6,000 pages" and the Fund had failed to establish that "the adminstrative record was [not] properly designated." 245 F. Supp. 2d at 57-58.

The Fund also claimed the Service had violated the NEPA when it set the maximum accidental take of trumpeter swans without first having compiled an EIS. The district court rejected the Fund's NEPA claim because it determined the Service had in the EA "adequately considered and disclosed the environmental impact of the Trumpeter swan quota" and because -- adverting to the criteria set forth in 40 C.F.R. § 1508.27(b)(4)-(9) -- "the quota did not have highly controversial or uncertain effects and was not likely to cause loss of historic resources, establish a precedent, or adversely affect a threatened species." 246 F. Supp. 2d at 47-48.

Finally, the Fund claimed the 2001 EA violated the MBTA, 16 U.S.C. §§ 703-712, which implements several treaties protecting migratory birds. The MBTA, the Fund argued, does not permit the Service to balance the interests of hunters against "the specific factors set forth in the MBTA, such as the 'distribution, abundance, ... [and] breeding habits' of Trumpeter swan populations." Amended Complaint at ¶ 147 (quoting 16 U.S.C. § 704(a)). The district court, upon concluding the Service had given "due regard to the MBTA factors ... and did

not exceed [its] statutory authority in considering non-statutory factors," 246 F. Supp. 2d at 41, granted summary judgment in favor of the Service.

In 2003, after the district court had disposed of the Fund's claims under the APA, the NEPA, and the MBTA, the Service issued a new EA. *See* U.S. Fish and Wildlife Service, Proposal to Establish Operational General Swan Hunting Seasons in the Pacific Flyway (Aug. 5, 2003). The new EA, accompanied by a new FONSI, became the basis for the provisions of the framework regulations governing the hunting of tundra swans during the 2003, 2004, and 2005 seasons. *See* 68 Fed. Reg. 55,784, 55,787 (Sept. 26, 2003); 69 Fed. Reg. 57,140, 57,149 (Sept. 23, 2004); 70 Fed. Reg. 55,666, 55,678 (Sept. 22, 2005). Although the 2001 and 2003 EAs specify the same quotas for Utah and Nevada, the 2003 EA includes data from the 2002 season and newly conditions the authorization of Utah's tundra swan hunting season upon a "Memorandum of Agreement" between the Service and that State "to improve collection of information on harvested swans."

## II. Analysis

The Service contends all the Fund's claims, whether they relate to the Fund's 2000 listing petition or to the Service's 2001 EA, are moot. The Fund, for its part, resists on both fronts and seeks a ruling on the merits of all its claims.

## A. The 2000 Listing Petition

The district court amended its judgment and dismissed as moot the Fund's claim under the ESA because the finding the Service issued in January 2003 fully cured the defects of its

September 2000 letter, 311 F. Supp. 2d at 8. We review the district court's determination of mootness *de novo*. *City of Houston v. Dep't of Hous. and Urban Dev.,* 24 F.3d 1421, 1426 (1994).

The Fund argues the 90-day finding did not supercede or amend the earlier letter, which addressed the Fund's petition to "initiate emergency listing under section 1533(b)(7) of the ESA." Under the Fund's theory, the Service conclusively decided the issue of emergency listing in 2000, as evidenced by the letter. The district court, by this account, erred when it decided "retroactively [to] dismiss [the Fund's] claim concerning the Service's September 2000 decision denying emergency listing because an extra-record, *post-hoc* document issued in January 2003 somehow cured the agency's failure to provide a coherent statement of reasons in September 2000." Moreover, the Fund points out that on its face the "90-day finding does *not* purport to 'repromulgate,' 'revise,' cancel, modify, or supercede the September 2000 emergency listing decision in any way."

In response the Service contends that a "negative determination on the 90-day finding necessarily meant that emergency listing was not warranted." In addition, the Service argues that although it responded promptly to the Fund by letter, it was under no obligation to respond at all because the "statutory and regulatory provisions addressing emergency listing do not provide for petitions." *See* 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14.

Contrary to the Fund's suggestion, the ESA clearly establishes but a single petition process for listing a species as endangered or threatened, *see* 16 U.S.C. § 1533(b)(3)(A); there

is no separate process in the ESA or its implementing regulations for requesting an "emergency listing" as opposed to a "non-emergency" listing. Although § 1533(b)(7) does permit the Secretary to list a species based upon an "emergency posing a significant risk to the well-being of [that] species," that type of listing is expressly committed to the Secretary's "discretion," the exercise of which is not structured by any statutorily prescribed criteria or procedures. The Fund therefore had no statutory right to petition the Secretary for an emergency listing under § 1533(b)(7), and no right to a decision meeting any particular procedural or substantive standards. Insofar as the Service's letter of September 2000 addressed the Fund's petition for non-emergency listing, the district court did not err in dismissing as moot the Fund's claim because the letter was superceded in full by the belated 90-day finding. This sequence of events is analogous to the merger of a preliminary injunction into a permanent injunction, upon which "an appeal from the grant of [the] preliminary injunction becomes moot." *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 314 (1999).

B. The 2001 EA

The Service contends the Fund's claims under the APA, the NEPA, and the MBTA are moot because the Service "relied on the 2001 EA for two hunting seasons -- 2001-02 and 2002-03 -- and has subsequently relied on the 2003 EA." The Fund confirmed at oral argument that the "crux of [its] challenge was to the [2001] EA." Although the 2001 EA and the regulations based thereupon are no longer in effect, the Fund argues its present dilemma is one "capable of repetition, yet evading review." *So. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911). In particular, the Fund maintains "the Service's

approach virtually guarantees that their EAs will 'systematically evade review,' since at any point in the judicial review process, the agency can simply issue a new EA and declare 'moot' any legal challenge."

Under the law of this circuit, regardless whether the present situation is "capable of repetition," it is not one "evading review." As a general rule, two years is enough time for a dispute to be litigated. *See LaRouche v. Fowler*, 152 F.3d 974, 978 (D.C. Cir. 1998); *see also So. Pac. Terminal*, 219 U.S. at 514-16 (duration of less than two years insufficient to litigate dispute).

The 2001 EA was issued in June of that year and remained in effect until August 2003, or somewhat more than two years. The 2003 EA has already been in effect for more than two years and has served as the basis for the relevant provisions of the 2003, 2004, and 2005 regulations; the 2003 EA will therefore be in effect for at least three years. Moreover, the Fund has offered no evidence for its suggestion that the Service is cynically inclined to "moot any legal challenge" the Fund may mount in the future. Because the 2001 EA has long since been succeeded and the situation of which the Fund complains, should it recur, is not one likely to evade review, we dismiss as moot the Fund's claims under the APA, the NEPA, and the MBTA.

Finally, the Service argues we should not vacate the orders under review because this case was mooted as a "result of events within the control of ... the Fund." In particular, the Service contends the Fund should have sought expedited review in this court during the six months between the district court's ruling and the issuance of the 2003 EA. Be that as it may, "we have repeatedly held that we will not consider the possibility of

expedited review in determining mootness." *Hinckley v. United States*, 163 F.3d 647, 651 n.8 (1999).

The Service also faults the Fund for not severing its claims under the ESA from those under the APA, the NEPA, and the MBTA for purposes of appellate review; the pendency in the district court of the Service's motion for reconsideration of the ESA claim then would not have delayed our consideration of the Fund's other claims. As the Fund points out, however, it did attempt to appeal "the MBTA and NEPA claims that were not subject to the [Service's] motion to amend the judgment as to the ESA claims." Rather than separately entertain the non-ESA claims, however, the court held them in abeyance pending resolution of the Service's motion. The Fund therefore did not sit on its hands, as the Service suggests.

Because the Service mooted the claims then pending before us, the Fund should not be prejudiced by orders that have not been reviewed on their merits. Indeed, vacatur is "commonly utilized in precisely this situation to prevent a judgment, unreviewable because of mootness, from spawning any legal consequences." *Munsingwear*, 340 U.S. at 41.

## III. Conclusion

In sum, none of the Fund's claims presents a live controversy. We therefore affirm the order of the district court amending its judgment and dismissing as moot the Fund's claim under the ESA, dismiss as moot the Fund's claims under the APA, the NEPA, and the MBTA, and vacate the orders of the district court relating thereto.

*So ordered.*