*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0096P (6th Cir.)
File Name: 04a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

B&B TRUCKING, INC.;
CAUSLEY TRUCKING, INC.;
CLIFF BLACKBURN; FEDRIZZI,
INC.; FOREMAN BROS., INC.;
GEORGE E. CAMPBELL AND
SONS, INC.; L.R. VINCENT
TRUCK AND SERVICE, INC.;
M.C. EIPPERLE, INC.;
MASSMAN TRUCKING, INC.;
P-D TRUCKING, INC.; ROBERT
M. NEFF, INC.; ROTH
TRUCKING, INC.; ROYSTER
ENTERPRISES, INC.; SODREL
TRUCK LINES, INC.; TAYLOR
POSTAL CONTRACTING, INC.;
NATIONAL STAR ROUTE MAIL
CONTRACTORS ASSOCIATION;
B&B INDUSTRIES, INC.; B&T
MAIL SERVICES, INC.; SHEEHY
MAIL CONTRACTORS, INC.,
          *Plaintiffs-Appellants,*

v.

No. 02-1562

2    *B&B Trucking, Inc., et al. v.          No. 02-1562
     United States Postal Service*

UNITED STATES POSTAL
SERVICE,
          *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-72978—Avern Cohn, District Judge.

Argued: October 29, 2003

Decided and Filed: April 2, 2004

Before: CLAY and COOK, Circuit Judges; STAFFORD,
District Judge.*

_____

### COUNSEL

**ARGUED:** Sharon Ambrosia-Walt, HOUGER & WALT,
Seattle, Washington, for Appellants  Sheila H. Gaskell,
ASSISTANT UNITED STATES ATTORNEY, Detroit,
Michigan, for Appellee. **ON BRIEF:** Sharon Ambrosia-
Walt, HOUGER & WALT, Seattle, Washington, Larry J.
Saylor, Frederick A. Acomb, MILLER, CANFIELD,
PADDOCK & STONE, P.L.C., Detroit, Michigan, for
Appellants.   Sheila H. Gaskell, ASSISTANT UNITED
STATES ATTORNEY, Detroit, Michigan, for Appellee.

   CLAY, J., delivered the opinion of the court, in which
STAFFORD, D. J., joined.  COOK, J. (pp. 31-37), delivered
a separate dissenting opinion.

_____

*The Honorable William Stafford, Senior United States District Judge
for the Northern District of Florida, sitting by designation.

---

**OPINION**

---

CLAY, Circuit Judge.  Plaintiffs, B&B Trucking, Inc., et al., appeal from the order of the United States District Court for the Eastern District of Michigan, entered on January 30, 2002, granting the motion of Defendant, United States Postal Service ("USPS"), to dismiss for lack of subject matter jurisdiction, in this action asserting constitutional rights and rights allegedly established by postal regulations.  For the reasons set forth below, we **REVERSE** the district court on all claims, except for the claim for performance of the HCR contracts.

## BACKGROUND

### Procedural History

On August 6, 2001, Plaintiffs filed suit to enjoin the USPS from demanding that Plaintiffs, as motor carriers, begin complying with the USPS' national fuel program.  Defendant filed a motion to dismiss on grounds that the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613 divested the district court of jurisdiction.  After hearing oral argument on December 12, 2001, the district court held its ruling in abeyance, to allow Plaintiffs to amend their filings.

On January 9, 2002, Plaintiffs filed a second amended complaint, seeking declaratory and injunctive relief for (1) violation of Plaintiffs' Fifth Amendment rights, (2) violation of postal regulations, and (3) violation of the due process clause by arbitrary agency action without statutory authority.

The district court issued an order, entered on January 30, 2002, granting the motion of Defendant to dismiss for lack of subject matter jurisdiction.  On April 1, 2002, the district court issued an order denying Plaintiffs' motion for reconsideration, and Plaintiffs filed a timely appeal.

### Substantive Facts

Plaintiffs are independent contractors who transport the mail on highways for Defendant.  Plaintiffs have fixed-rate contracts: the rate that Defendant pays Plaintiffs is determined with reference to Plaintiffs' annual estimates of the cost and amount of fuel that will be needed in transporting the mail.  If fuel costs increase during the life of a contract, rendering inaccurate the estimates upon which the contract payments were determined, then Plaintiffs have the contractual right to request an adjustment in the contract price.  Per Clause B-65 of the contract, Defendant's contracting officer must accede to a request for an increase in price for it to take effect.  Because the fuel prices that Plaintiffs pay are passed on to Defendant in pre-contract estimates and potentially in requests that are granted for adjustments during the life of the contracts, Defendant has an incentive to find methods of limiting Plaintiffs' fuel costs.

To reduce Plaintiffs' fuel costs, Defendant entered into fuel supply contracts with fuel manufacturers Exxon-Mobil and BP Amoco.  These contracts are referred to by Plaintiffs as "Exxon contracts."  Plaintiffs characterize the Exxon contracts as granting Exxon-Mobil and BP Amoco exclusivity: "[t]he Exxon contracts grant Exxon-Mobil the right to be the sole fuel supplier throughout the eastern seaboard region and central region . . . and the right to BP Amoco to be the sole fuel supplier in the central, midwestern and western regions of the United States . . . ." (Petitioners' Br. at 9.)  The Exxon contracts designate the material terms of the sale of fuel, including price, fuel grade and quality, quantity, and timing.

In addition, the contracts give Exxon-Mobil and BP Amoco the right to enter certain properties to supply fuel: "[t]he Exxon contracts identify the motor carriers with bulk fuel tanks within the specific geographic location and designate them as 'fuel sites' to which the sale and delivery of fuel will be made." (Petitioners' Br. at 9.) This provision appears to give Exxon-Mobil and BP Amoco the right to enter certain Plaintiffs' land to fill certain fuel tanks, since some or all of Plaintiffs have installed their own private "bulk fuel tanks (tanks that are used not just for mail transportation but for all their business needs and that were installed, on their own property, at their expense, and not pursuant to any terms of a USPS contract)." (Petitioners' Br. at 20-21.)

None of Plaintiffs were privy to the Exxon contracts, and none of Plaintiffs were consulted regarding the terms of these contracts. Plaintiffs' original contracts with the USPS did not contain terms governing the choice of fuel suppliers. The fuel-cost-reduction program was expanded to reach Plaintiffs through implementation of the Bulk Fuel Purchase Plan, which, in Defendant's view–through Amendment 3 to Defendant's contracts with Plaintiffs–requires mail transporters to purchase fuel from Exxon-Mobil and BP Amoco. Some but not all of Plaintiffs agreed to Amendment 3 to contracts with the USPS, without overt pressure from the USPS. Then, at some point, those Plaintiffs whose contracts did not yet contain Amendment 3 were pushed to adopt the amendment, inasmuch as they were "flatly told that [their] contracts would not be renewed without the clause." (J.A. at 394) (affidavit of an officer of one of Plaintiffs).

Compliance with the Exxon contracts was problematic for Plaintiffs. Arguably, arranging for their own fuel supply for their vehicles had allowed Plaintiffs to meet their fuel needs most effectively, altering the fuel supplied to their own trucks to reflect climate, terrain, road, and truck-specific conditions and variables. Some or all of Plaintiffs had installed their

own fuel tanks at their own expense, as part of the endeavor of arranging for their own fuel supply. The Exxon contracts gave control to Exxon-Mobil and BP Amoco over the fuel to be supplied to these tanks and the pricing of the fuel.

## DISCUSSION

The only issue before this Court is whether the district court properly dismissed for lack of subject matter jurisdiction. A dismissal for lack of subject matter jurisdiction is reviewed *de novo*, with the plaintiff bearing the burden of establishing jurisdiction and the court taking the allegations in the complaint as true. *Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003). *See also Green v. Ameritech Corp.*, 200 F.3d 967, 972 (6th Cir. 2000) (*de novo* standard of review).

There are two steps to the analysis, each of which is briefly summarized here. The first step is to place this case within the framework of the applicable larger jurisdictional issues and to set forth the appropriate legal standard. Where, as here, the government is the defendant, the Contract Disputes Act bars a district court from exercising jurisdiction over any individual claim that is contractual, when evaluated by the source of the rights claimed and the relief sought (or appropriate). Case law clearly establishes that claims are not necessarily rendered contractual by the presence of a contractual relationship between the parties. In two prominent cases, there was a contractual relationship between plaintiffs and defendants, but nonetheless the claims were held to be non-contractual. *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 3-4 (D.C. Cir. 1998); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 961-62, 968-69 (D.C. Cir. 1982).

The second step is to determine whether the standard for jurisdiction is satisfied. In the present case, much of the determination as to whether the standard is met depends on the relevance of Defendant's arguments that Plaintiffs

contractually waived the rights that they assert. Here, it is important to note that the applicable test (as set forth and as clarified in case law) is similar to the well-pleaded complaint rule (which governs the more general jurisdictional issue of whether there is federal question jurisdiction, under 28 U.S.C. § 1331). Under the Contract Disputes Act, the relevant question is whether a claim (measured by the rights claimed and the proper relief) would appear to be contractual on the face of a well-pleaded complaint. As with the well-pleaded complaint rule, the substance of a defense is irrelevant–a well-taken contractual rebuttal argument has no bearing on jurisdiction, if the issue would not appear in a well-pleaded complaint. Applying these principles, the district court had jurisdiction over all claims, except for the claim for enforcement of the HCR contracts.

## I.

Plaintiffs contend, and Defendant does not contest, that if sovereign immunity has been waived, then the district court would have jurisdiction over the claims in this case. Plaintiffs argue that absent sovereign immunity, the district courts would have jurisdiction through at least one of three independent grants of jurisdiction, each of which would be sufficient. First, Plaintiffs cite the Postal Reorganization Act, 39 U.S.C. § 401 *et seq.*, whose section 401(1) grants the USPS the authority "to sue and be sued in its official name." Secondly, Plaintiffs point to 28 U.S.C. § 1339, which states: "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service." *See also Owen v. Mulligan*, 640 F.2d 1130, 1134 n.10 (9th Cir. 1981) ("if the suit is characterized as one requiring the Postal Service to follow its own regulations, there is jurisdiction. 39 U.S.C. § 409(a); 28 U.S.C. § 1339."). Finally, Plaintiffs point out that there may be federal question jurisdiction, under 28 U.S.C. § 1331. Plaintiffs claim that *Califano v. Sanders*, 430 U.S. 99, 105 (1977) establishes that regulations of federal agencies are federal "laws."

Without determining the validity of the third basis of jurisdiction claimed, Plaintiffs' first and second proffered bases for jurisdiction establish that if sovereign immunity does not apply, then the district court had jurisdiction. The question, then, is whether sovereign immunity applies. The Contract Disputes Act ("CDA") states: "All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a). If Plaintiffs' claims against Defendant do not "relat[e] to a contract," under the meaning of the CDA, then sovereign immunity has been waived; otherwise, a district court would lack jurisdiction to hear the claims, which could only be brought before the Court of Federal Claims. 41 U.S.C. § 609(a)(1) ("Except as provided in paragraph (2), and in lieu of appealing the decision of the contracting officer under section 6 [41 U.S.C. § 605] to an agency board, a contractor may bring an action directly on the claim in the United States Claims Court [United States Court of Federal Claims], notwithstanding any contract provision, regulation, or rule of law to the contrary.").

At the outset, it is apparent that the contract itself does not answer the question of whether Plaintiffs' claims "relat[e] to a contract." The contract in the present case contains a clause that states: "This contract is subject to the Contract Disputes Act of 1978 (41 U.S.C. 601-613) ('the Act'). Except as provided in the Act, all disputes arising under or relating to this contract must be resolved under this clause." (J.A. at 327.) This language begs the question. The clause only applies to disputes "arising under or relating to this contract." The term "relating to a contract" is the same standard used by the CDA. Thus, the contractual clause resolves nothing. If a claim "relat[es] to a contract" then, regardless of any language in the contract, the CDA bars the claim from being brought in a district court. If a claim does not "relat[e] to a contract," then neither the contract clause nor the CDA bars the claim from being brought in a district court. (The contractual

phrase "arising under . . . this contract" is not sufficiently different from the phrase "relating to this contract" to alter this analysis.)

To resolve the question of whether the CDA bars a district court from assuming jurisdiction over some or all of Plaintiffs' claims, the analysis is rather complicated. Some complexity arises from the fact that a dispute *as a whole* may relate *in part* to a contract between the plaintiff(s) and the defendant(s)–i.e., the dispute may "relat[e] to" quite a number of issues, some of which involve a contract, perhaps as an ancillary item. The CDA makes clear that the nature of the dispute *as a whole* is irrelevant. Rather, claims must be examined individually to determine whether the CDA applies. The CDA states: "All *claims* by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer." 41 U.S.C. § 605(a) (emphasis added); *Campanella v. Commerce Exch. Bank*, 137 F.3d 885, 891 (6th Cir. 1998) ("We must next decide which of the plaintiffs' claims constitute 'contract' claims within the meaning of the CDA.").

In determining whether the CDA applies to a given claim, an individual claim may appear to relate *only in part* to a contract between the parties, creating difficulty in determining whether the claim *as a whole* "relat[es] to a contract." Furthermore, it is not wholly obvious what it means to "relat[e]" to a contract, in the first place. Fortunately, the standard has been defined through case law. In *RMI Titanium Co. v. Westinghouse Elec. Corp.*, this Court provided the applicable standard, which was adopted from the D.C. Circuit's ruling in *Megapulse, Inc. v. Lewis*:

[F]or the CDA to apply, it must first be determined that the claims asserted are "essentially contractual" in nature. *Megapulse, Inc. v. Lewis*, 217 U.S. App. D.C. 397, 672 F.2d 959, 967 (D.C. Cir. 1982). . . . "The classification of a particular action as one which is or is not 'at its

essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claim, and upon the type of relief sought (or appropriate)." *Megapulse*, *supra* at 968.

*RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1136 (6th Cir. 1996). As *RMI Titanium* stated the *Megapulse* test (hereinafter, "the *RMI Titanium*/*Megapulse* test"), the district court has jurisdiction over those claims, and only those claims, that are not deemed "essentially contractual," after a consideration of "the source of rights" of the plaintiff's claim and "the type of relief sought (or appropriate)." This test makes clear that the determination of whether the CDA bars jurisdiction depends on the plaintiff's claims, as stated in the complaint–as explained in issue II, below, a defendant's rebuttal points are not considered in this analysis, which makes the test similar to the well-pleaded complaint rule of federal question jurisdiction.

Under the *RMI Titanium*/*Megapulse* test, the presence of a contractual relationship between plaintiffs and defendants does not in itself render all claims "essentially contractual;" rather, the presence of a contract is relevant only insofar as it provides the source of the legal rights being claimed or the basis for relief. Thus, in the D.C. Circuit's *Megapulse* case itself, and in another ruling by the same circuit, the plaintiffs had contracts with the government, but, based upon analysis of the rights claimed and the relief requested, the court held that the CDA did not bar jurisdiction. *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 3-4 (D.C. Cir. 1998); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 961-62, 968-69 (D.C. Cir. 1982).[1]

---

[1]The two cases are discussed in more detail, below. The D.C. Circuit's rulings on this issue are of great importance, considering that this Court adopted the applicable legal standard from the D.C. Circuit's *Megapulse* ruling.

The *RMI Titanium/Megapulse* test for whether the CDA bars a district court from exercising jurisdiction, then, examines the legal basis for a plaintiff's well-pleaded complaint. The test looks at the totality of both the source of the rights in a given claim and the type of relief sought (or appropriate) for that claim. If an individual claim appears contractual after a consideration of the totality of the source of the rights and the relief, then the CDA bars a district court from exercising jurisdiction over that claim. If, after this analysis, the claim does not appear to be contractual, then a district court maintains jurisdiction over the claim.

## II.

The *RMI Titanium/Megapulse* test can be applied to the present case. Plaintiffs' second amended complaint asserted three causes of action. Plaintiffs sought declaratory and injunctive relief for (a) violation of the mail transporters' Fifth Amendment rights, (b) violation of postal regulations, and (c) violation of the due process clause by arbitrary agency action without statutory authority. The first "cause of action" asserted multiple claims.

As stated above, each of Plaintiffs' claims must be examined individually, in order to determine whether each claim is "essentially contractual." Yet because the relief sought (or appropriate) for most of the claims in this case is identical–declaratory and injunctive relief–most of the analysis of relief can be done without treating the claims separately. After examining relief, the analysis will look at the source of the rights for each individual claim, revisiting the issue of relief only as needed.

Before proceeding to the analysis of relief, there is a point of clarification. There are two categories of contracts in this case: first, the Exxon contracts (between the USPS and Exxon-Mobil and BP Amoco) and, secondly, those between the USPS and Plaintiffs. It is not disputed that privity is a

requirement for a contract to fall under the scope of the CDA, meaning that the first category of contracts are excluded–i.e., the Exxon contracts cannot be contracts to which Plaintiffs' claims "relat[e]."

### A. The type of relief sought (or appropriate) for Plaintiffs' claims

The district court did not consider the question of relief in the present case,[2] and so this Court must be the first to examine it. Plaintiffs argue that for their claims they seek non-contractual damages: "They ask neither for damages nor specific performance, but to enjoin the USPS from acting outside its authority." (Petitioners' Br. at 25.)

Defendant cites *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985), in an apparent attempt to argue that the type of relief alone is not dispositive. Defendant states that "[e]ven though IR sought only declaratory and injunctive relief . . . , the court followed the framework of *Megapulse* . . . concluding that the source of rights at stake was essentially contractual and IR could not avoid the jurisdictional bar of the CDA." (Respondent's Br. at 29.)[3]

If Defendant cites *Ingersoll* as an illustration of a case in which the (contractual) source of rights trumped the (non-contractual) relief requested, then Defendant is mistaken. In *Ingersoll*, the plaintiff had a contract to supply air

---

[2] Despite properly stating that the "essentially contractual" test demands consideration of both the rights and relief at stake, the district court never examined the relief sought (or appropriate) to determine whether or not the claims were "essentially contractual."

[3] In *Ingersoll*, the rights that served as the basis for the claim were viewed as contractual; the claim was characterized as essentially one of breach of contract. 780 F.2d at 77-78. The rights arose from a contract to supply the Air Force with air compressors. *Id.* a 76.

compressors to the Air Force, but the Air Force terminated the contract. 780 F.2d at 75. The plaintiff sought declaratory and injunctive relief that would prevent the Air Force from soliciting new bids–thus, the plaintiff sought to prevent the Air Force from replacing the plaintiff's contract. *Id.* The court concluded that essentially the plaintiff was seeking contractual relief, in the form of specific performance of the Air Force's contract with the plaintiff. *Id.* at 79-80 ("we find that the essence of I-R's claim is a request for specific performance of the original contract. From the outset, I-R has requested an order reinstating the original award of the contract.").[4]

Nor does another case cited by Defendant, *Campanella v. Commerce Exchange Bank*, 137 F.3d 885 (6th Cir. 1998), prove relevant to the relief requested in the present case. In *Campanella*, the plaintiff was due payment on a contract to which the Small Business Administration was a guarantor. *Id.* at 888. Two of the plaintiff's claims were "to enforce payment," i.e., to seek specific performance of a contract where payment was due–it was so clear that the relief requested for these claims was contractual that the plaintiff did not even contest this point. *Id.* at 888, 889 (describing the claims for rent and fees in commercial transactions as "two straight contract claims"), 891-92 (stating that the plaintiff did not dispute that two of the claims were contract claims). Another claim, based on *quantum meruit*, was clearly attempting to enforce a contract, as well. *Id.* at 892 ("The equitable doctrine of *quantum meruit* is based on an implied promise on the part of the defendant to pay the plaintiff as

---

[4]Not only was the type of relief sought, specific performance, related directly to the contract between the plaintiff and the Air Force; but also, other types of relief "appropriate" presumably would have included money damages–computed to place the plaintiffs in a position equal to that for which they had contracted. *See RMI Titanium*, 78 F.3d at 1136 ("'the type of relief sought (*or appropriate*).' *Megapulse*, *supra* at 968") (emphasis added).

much as he reasonably deserved to have for his labor.") (citation and internal quotation marks omitted). These circumstances are not similar to those in the present case.

By contrast to *Ingersoll* and *Campanella*, it is difficult in the present case to characterize as essentially contractual any of the relief sought or otherwise appropriate. Plaintiffs had contracts with Defendant which, through Amendment 3, appear to contain terms binding Plaintiffs to purchase fuel from the parties to the Exxon contracts. But Plaintiffs do not seek specific performance of this contract. In fact, Amendment 3 is the apparent cause of Plaintiffs' frustration. Thus, as in the *Megapulse* case itself (from which the legal standard was adopted by this Court), "It is actually the Government, and not Megapulse [the plaintiff], which is relying on the contract . . . ." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969 (D.C. Cir. 1982); *see also id.* ("[the plaintiff] does not claim a breach of contract, . . . it seeks no monetary damages against the United States, and its claim is not properly characterized as one for specific performance. . . ."). The government seeks to enforce Amendment 3, to the frustration of Plaintiffs.

Perhaps it could be argued that Plaintiffs really seek specific performance of the original, unamended contracts–thus the case would be similar to *Ingersoll*, in which the court determined that the plaintiff sought specific performance of the original contract. 780 F.2d at 79-80. But the original, unamended contract did not contain any terms guaranteeing Plaintiffs freedom to choose fuel suppliers. If anything, the original, unamended contract contained language stating that so long as it adjusts the contract price accordingly, Defendant has the right to dictate which fuel

suppliers Plaintiffs use.[5]     This case contrasts with the *Ingersoll* case, which dealt with a narrow set of facts relating to competitive bidding–as explained in issue II, below, the facts and the court's rationale are distinguishable from the present case, and one relevant part of *Ingersoll* is not good law in the D.C. Circuit.  On the issue of relief requested, the present case is more analogous to *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1 (D.C. Cir. 1998), which is described below; in that case, the plaintiffs challenged the government's termination of a contract, but nevertheless, the court determined that the CDA did not bar the claims.  *Id.* at 3-4.[6]

Although the relief requested does not initially appear to be contractual, the *RMI Titanium*/*Megapulse* test demands a consideration of both relief and the source of rights upon which each claim is based.  Thus, before reaching any final conclusions, the source of rights must be considered for each claim.

---

[5]Clause B-65(d) states, "Should the Postal Service introduce procedures which affect the supplier's obligations with respect to the costs of fuel or taxes, the contract price will be adjusted . . . ."  (J.A. at 290.)

[6]The present case cannot be analogized to *Ingersoll*, based upon vague, general similarities, such as the presence of a contract.  As *Ingersoll* stated, "As to whether the relief sought was essentially contractual, the [*Megapulse*] court recognized that the question 'may be resolved only against the facts of each case.' [*Megapulse,* 672 F.2d] at 970."  780 F.2d at 76-77.  Hence, it is not surprising that there was a different ruling on jurisdiction in *Commercial Drapery Contractors*, which also involved a contract but which had different facts than *Ingersoll*.

### B.     The sources of the rights upon which Plaintiffs base their claims

Plaintiffs assert three causes of action, the first of which encompasses multiple claims.

#### 1.     Plaintiffs' numerous claims for declaratory and injunctive relief for violation of the mail transporters' Fifth Amendment rights

Plaintiffs' first cause of action is an amalgam of numerous Fifth Amendment claims for deprivation of liberty and property interests without due process of law. (J.A. at 17-18) (Plaintiffs' Second Amended Complaint, paragraphs 6.1, 6.2, and 6.3).  There are three types of claims here.  Plaintiffs claim a violation of the property right to control use of Plaintiffs' fuel tanks.  Plaintiffs also claim the freedom to contract with fuel suppliers of their own choosing.   In addition, Plaintiffs assert various liberty rights to control the manner of the operation of Plaintiffs' business.  Each of the three categories is examined here.

#### a.     Deprivation of property interests

In one claim, Plaintiffs assert a deprivation of property interests.  Plaintiffs assert that the USPS violated "Plaintiffs' freedom to use their bulk fuel tanks for fuel products of their choosing, to limit and exclude products not of their choosing, and to control the use of their tanks and the surrounding

property."[7]  The Exxon contracts grant Exxon-Mobil and BP Amoco the right to enter certain properties to supply fuel.

Plaintiffs' asserted right to protect their property from being entered and used is not a contractual right. Plaintiffs were not parties to any contract with Exxon-Mobil or BP Amoco. The rights upon which this claim is ultimately based[8] arise from these Plaintiffs' title over the property upon which they have installed their own fuel tanks. Plaintiffs' Complaint describes this claim as "deprivation . . . of Plaintiffs' liberty and property interests, including . . . Plaintiffs' freedom to use their bulk fuel tanks for the fuel products of their choosing, to limit and exclude products not of their choosing, and to control the use of their tanks and the surrounding property." The title to the property is not a contractual right.

The only contract issues relating to the fuel tanks are Defendant's rebuttal points, which are not "the source of the rights upon which the plaintiff bases its claim." *RMI Titanium*, 78 F.3d at 1136. Perhaps the Fifth Amendment property right claim of Plaintiffs who own fuel tanks has no merit because, by signing Amendment 3, Plaintiffs bargained away their Fifth Amendment rights–but this argument speaks

---

[7] This claim is found in Plaintiffs' Complaint at paragraph 6.2, subpart (c). (J.A. at 18.) Plaintiffs assert that the USPS violated property rights, "including but not limited to 1) protecting their dominion over their privately owned bulk fuel tanks (tanks that are used not just for mail transportation but for all their business needs and that were installed, on their property, at their expense, and not pursuant to any terms of a USPS contract) . . . ." (Petitioners' Br. at 20-21.)

[8] The due process clause itself does not provide the source of property rights. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.").

to the merits of the claim, not to the jurisdictional issue of the source of the rights upon which the claim is based.

It is well-established that the existence of contractual rebuttal points does not render a claim "essentially contractual," in CDA analysis. The D.C. Circuit–the very circuit that devised the CDA test adopted by this Court–has ruled that a claim is not rendered "essentially contractual" merely because a contract issue may prove dispositive to the claim. In *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1 (D.C. Cir. 1998), a business, Commercial Drapery Contractors ("Commercial"), had contracts with the federal government's General Services Administration ("GSA"). *Id.* at 3. After a grand jury returned a fraud indictment against Commercial and its president, the GSA terminated its contract with Commercial and suspended future contracting with Milford Acquisition Corporation ("Milford"), a company that was owned by Commercial's president and his wife. *Id.* Commercial and Milford brought suit, "claiming that GSA's cancellation and suspension decisions violated multiple government procurement statutes and regulations, and constituted 'de facto debarment' or 'blacklisting,' thereby depriving them of due process." *Id.*

The D.C. Circuit ruled that the CDA did not bar jurisdiction:

Among other things, Commercial and Milford complain about the termination clause in their contracts. That sounds like a claim founded on a contract. But "classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claim, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C.Cir.1982). The basis of Commercial's and Milford's claim is that GSA's repeated attempts to extricate the government from financial dealings with

them constituted unlawful "blacklisting." The dispute over the termination clause in their contracts is embedded within this broader claim, and is not an independent cause of action. . . . The claim and the type of relief requested thus reveal that this is not "at its essence" a contract action. Accordingly, we have jurisdiction.

*Id.* at 4. This ruling made clear that the mere existence of a contract issue within a broader claim does not make the claim "essentially contractual," where the source of the rights claimed and the relief are not contractual.

The ruling in *Commercial Drapery Contractors* cited *Megapulse*, the very case that defined the applicable legal standard. In *Megapulse*, the plaintiff, Megapulse, had contracts with the Coast Guard, pursuant to which Megapulse had developed proprietary data. 672 F.2d at 961-62. When, based on the Coast Guard's determination that the data had not been developed solely at Megapulse's expense, the Coast Guard decided to release the data to other parties, Megapulse brought suit for an injunction to prevent the release of data. *Id.* at 962. The D.C. Circuit made clear that the existence of relevant contractual issues did not render all claims "essentially contractual":

> Contract issues may arise in various types of cases where the action itself is not founded on a contract. A license, for example, may be raised as a defense in an action for trespass, or a purchase contract may be raised to counter an action for conversion. But the mere fact that a court may have to rule on a contract issue does not, by triggering some mystical metamorphosis, automatically transform an action based on trespass or conversion into one on the contract and deprive the court of jurisdiction it might otherwise have.

*Id.* at 968. Applying this general principle, the court determined that the CDA did not bar jurisdiction, because, "Appellant's position is ultimately based, not on breach of contract, but on an alleged governmental infringement of property rights and violation of the Trade Secrets Act. It is actually the Government, and not Megapulse, which is relying on the contract . . . ." *Id.* at 969. As in *Megapulse*, so too in the present case, it is the government–and not any of the plaintiffs–that is attempting to assert contractual rights (those purportedly in Amendment 3).

The rule that a rebuttal issue cannot alter the nature of the claims is analogous to the well-pleaded complaint rule that governs federal question jurisdiction under 28 U.S.C. § 1331. Under the well-pleaded complaint rule, "'[W]hether a case is one arising under [federal law], in the sense of the jurisdictional statute, . . . must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, *unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose.*' *Taylor v. Anderson*, 234 U.S. 74, 75-76 (1914); *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149 (1908)." *Okla. Tax Comm'n v. Graham*, 489 U.S. 838, 840-41 (1989) (emphasis added). The *RMI Titanium/Megapulse* test is similar to the well-pleaded complaint rule in that both tests evaluate jurisdiction by the underlying rights upon which a plaintiff bases its claims, without reference to any rebuttal points. This similarity is logical. Both tests concern the issue of jurisdiction. Jurisdiction is generally established by a plaintiff, through the complaint. *E.g.*, *Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003) (the plaintiff bears the burden of establishing jurisdiction with the court taking the allegations in the complaint as true).

In the present case, a well-pleaded complaint would not necessarily even mention the very term of the contract that Defendant considers dispositive, i.e., Amendment 3. A well-

pleaded complaint would not refer to the contracts between Plaintiffs and Defendant. Rather, the complaint would only refer to the Exxon contracts–which were made without Plaintiffs' consent, and which Plaintiffs seek to nullify.[9]  A complaint would allege that the Exxon contracts had violated Plaintiffs' property rights, by granting Exxon-Mobil and BP Amoco the right to enter Plaintiffs' land.  The Exxon contracts are a key part of the factual basis for the complaint. But source of the rights upon which Plaintiffs base their claim is not the Exxon contracts or any other contract.  It is undisputed that Plaintiffs were not privy to the Exxon contracts.[10]  The property rights claim attempts to void the Exxon contracts due to violation of Plaintiffs' constitutional rights.  The contractual relationship between Plaintiffs and Defendant is not the source of the rights upon which Plaintiffs base their property rights claim–this is similar to *Commercial Drapery Contractors* and *Megapulse*, in which the rights claimed did not stem from the contractual relationship between the parties.

Plaintiffs actual complaint is consistent with this analysis of a well-pleaded complaint.[11]  The actual complaint focuses

---

[9]There may be some confusion here, because there are two sets of contracts, first, those between Plaintiffs and Defendant and, secondly, the Exxon contracts between Defendant and Exxon-Mobil and BP Amoco. Yet Plaintiffs' claim here is not founded upon the rights in either class of contracts.

[10]For a claim to be contractual–and thus fall within the realm of the Court of Federal Claims–the claim must attempt to enforce a contract to which the plaintiff was a party.  *E.g.*, *Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed. Cir. 1994) ("Absent privity between Hollywood Associates and the government, there is no case [in the Court of Federal Claims].").

[11]Plaintiffs' actual complaint is relevant only insofar as it confirms our analysis of a well-pleaded complaint.  That is, even if Plaintiffs' actual complaint was not well-pleaded but, rather, set forth rebuttal arguments to contractual defenses, this would not alter the nature of

---

almost entirely on the Exxon contracts, as violating Plaintiffs' property rights, without Plaintiffs' consent.  Nowhere in Plaintiffs' actual complaint is there any mention of Plaintiffs' contracts with Defendant[12]–even though Amendment 3 to these contracts might rebut Plaintiffs' claims, on the merits. A well-pleaded complaint does not refute itself.  Defendant's rebuttal does not bear on the source of rights upon which Plaintiffs base their property rights claim.

Absent the contractual rebuttal points, there are no contractual issues relating to the claim for deprivation of property–the source of the rights asserted in this claim is not found in any contract.  The source of the rights asserted is the title to Plaintiffs' land.

### b.   Freedom to contract with fuel suppliers of Plaintiffs' choosing

Moving on to other claims in the first "cause of action," Plaintiffs also claim a liberty interest in the "freedom to contract with fuel suppliers of their own choosing."[13]  On rebuttal, it is possible that Defendant would establish that Plaintiffs chose to forfeit this freedom, in order to maintain their USPS contracts.  If Plaintiffs had chosen not to sign Amendment 3 to their USPS contracts, the USPS would not have interfered with their fuel dealings; instead the USPS merely would have declined to renew its contracts with Plaintiffs.  But, as stated directly above, contract issues that

---

Plaintiffs' claims.

[12]Even if, in describing the factual background, Plaintiffs' complaint had referenced Plaintiffs' contracts with Defendant, this would not alter the nature of Plaintiffs' claims.

[13]This claim is found in Plaintiffs' Complaint at paragraph 6.2, subpart (a).  (J.A. at 18.)

would arise only in rebuttal do not render contractual an otherwise non-contractual claim. *Commercial Drapery Contractors*, 133 F.3d at 4; *Megapulse*, 672 F.2d at 968.

### c.   Other liberty interests

Additionally, Plaintiffs attempt to assert multiple liberty interests, in asserting a deprivation of "freedom from interference to operate their business, perform their HCR contracts, and to make business decisions concerning the terms and conditions of the purchase of supplies such as fuel."[14]   Plaintiffs "freedom from interference . . . and to make business decisions" is not rooted in contract. It is possible that Plaintiffs bargained away the freedoms being claimed, but again that is merely a rebuttal point. *Commercial Drapery Contractors*, 133 F.3d at 4; *Megapulse*, 672 F.2d at 968.

The only rights asserted in this "cause of action" that are based upon contractual sources are Plaintiffs' rights to "perform their HCR contracts." The HCR contracts are the original contracts between Plaintiffs and Defendant as they existed prior to Amendment 3–here, Plaintiffs assert that subsequent acts by the USPS breached that contract. Clearly, a claim to enforce the original contracts is grounded in rights whose source is contractual–this claim is identical to the attempt to enforce the original contract (by requesting specific performance) in *Ingersoll*, where the plaintiff sought declaratory and injunctive relief to prevent the Air Force from soliciting new bids in a process that would replace the plaintiff's contract. 780 F.2d at 79-80. That this claim is based on a contract is clear from the fact that the very rights at stake can only be identified with reference to the HCR contracts. As in *Ingersoll*, the relief requested here is specific performance of the original contract. The claim of a right to

---

[14](J.A. at 18) (Plaintiffs' Complaint, paragraph 6.2, subpart (b)).

perform HCR contracts is "essentially contractual." This claim provides a striking contrast to all of the other claims in this case, which are not based on rights found in a contract and which do not seek contractual relief, in the form of specific performance (or money damages).

The contractual claim for performance of HCR contracts does not pollute the non-contractual assertions of Fifth Amendment rights. It would be absurd to characterize Plaintiffs' entire first "cause of action" as one "claim." The first "cause of action" contains three sub-parts. Hence, it is likely that there are at least three claims under this "cause of action," and in fact there are probably even more, since one of the sub-parts (asserting, *inter alia*, the HCR contract argument) asserts numerous legal rights. The definition of a claim, within the CDA context, comes from the *RMI Titanium*/*Megapulse* test–a claim is distinct if it is founded upon distinct legal rights. In stating that the characterization of a claim as "essentially contractual" depends on "the source of the rights upon which the plaintiff bases its claim,"[15] *RMI Titanium* indicated that claims are defined by their underlying rights; thus, by definition, in CDA analysis, an assertion of non-contractual legal rights would be a distinct "claim" from an assertion of contractual legal rights. *See also* BLACK'S LAW DICTIONARY 240 (7th ed. 1999) (one definition of a "claim" is "the assertion of an existing right"). (If, *arguendo*, the entire first "cause of action" were somehow viewed as a single "claim," then it is doubtful that there would be a valid basis for dismissing the entire "claim," on the basis of the small part of the claim that is based upon the rights in the HCR contracts. This question, though, need not be considered.)

---

[15]78 F.3d at 1136.

The rights upon which Plaintiffs base their claims are not contractual with respect to any Fifth Amendment claim other than the claim of liberty to perform HCR contracts.

### 2. Plaintiffs' claim for declaratory and injunctive relief for violation of postal regulations

Plaintiffs' second cause of action is the claim that Defendant has violated its own regulations. Plaintiffs state that regulations forbid the USPS from limiting Plaintiffs' freedom to purchase fuel from any source that Plaintiffs wish. Plaintiffs cite a regulation that "[t]he postal service is not permitted to tell a contractor how or when to purchase supplies . . . ." (J.A. at 209) (quoting USPS Management Instruction PO-530-97-1). Plaintiffs also cite a regulation that "[p]urchases of fuel may be made from any source at the option of the contractor." (J.A. at 216) (quoting USPS Management Instruction PO-530-97-1).

On the merits, a question arises as to whether these regulations vest private rights of action to enforce the regulations. The question is whether mail transporters (Plaintiffs) and/or fuel suppliers (e.g., those other than Exxon-Mobil and BP Amoco) have the right to sue to force the USPS to comply with the regulations.[16] But this question is not relevant to a ruling on jurisdiction. The "essentially contractual" test of *RMI Titanium*, from *Megapulse*, examines "the source of the rights upon which the plaintiff bases its claim," without requiring that those claimed rights even exist. If the rights do not exist, then the court will grant a motion to dismiss for failure to state a claim–but the court will not deny its jurisdiction over the claim.

The district court and Defendant attempt to deem this claim contractual, by likening it to *Ingersoll*. In *Ingersoll*, the

---

[16] *See Alexander v. Sandoval*, 532 U.S. 275 (2001).

named plaintiff "alleg[ed] that the government's decision to terminate I-R's contract to supply air compressors and to resolicit bids for the contract was . . . contrary to several federal acquisition regulations." 780 F.2d at 74. Yet *Ingersoll* does not govern the present case. In *Ingersoll*, the court, in addition to classifying the relief sought as contractual, offered three reasons for ruling that the source of the rights in the claim for violation of regulations was contractual. The court stated:

First, it is possible to conceive of this dispute as entirely contained within the terms of the contract. The contract included a termination-for-convenience clause. . . .

Second, the issues raised by plaintiff's complaint are within the unique expertise of the Court of Claims. The substance of I-R's complaint is that the Air Force had no good reason to terminate the contract and begin resolicitation. This complaint, unlike a complaint based, for example, on a violation of the civil rights of the contractor, calls for knowledge of the government contracting process. . . .

Finally, despite I-R's characterization, see Br. for Appellant at 34, we find that I-R is not a "frustrated bidder." I-R asserts that its action is no different from a bid protest action. *See Scanwell Laboratories, Inc. v. Shaffer*, 137 U.S. App. D.C. 371, 424 F.2d 859 (D.C. Cir. 1970).

*Id.* at 78. None of these three reasons prove controlling in the present case.

Setting aside the first reason momentarily, it is clear that the other two reasons do not apply to the present dispute. The second reason from *Ingersoll* is not applicable to the present dispute, because Plaintiffs claim in the present case does not relate to the contracting process. *Ingersoll* was a case

involving the rules and process of competitive bidding for the awarding of government contracts. *Id.* at 75. The present case does not involve the awarding of contracts among competitors; thus, the third reason in *Ingersoll* clearly does not apply to the present case, which does not involve a "frustrated bidder."

The first reason given in *Ingersoll* might apply to the present case: by signing Amendment 3, Plaintiffs might have contractually waived any rights that vested under the regulations. Nonetheless, the present dispute is not governed by *Ingersoll*. It appears that the D.C. Circuit's first reason for ruling that the source of the rights was contractual never was good law within that circuit. In ruling that the source of the rights in the claim was contractual because "it is possible to conceive of this dispute as entirely contained within the terms of the contract," the D.C. Circuit classified the claim on the basis of a rebuttal point embedded within a larger claim–the D.C. Circuit thus ran afoul of the principle that the mere existence of a contract issue within a broader claim does not make the claim "essentially contractual," where the source of the rights claimed and the remedies are not contractual. *Commercial Drapery Contractors*, 133 F.3d at 4; *Megapulse*, 672 F.2d at 968. Since the "within the terms of the contract" point in *Ingersoll*, a 1985 opinion, is contrary to the same circuit's 1982 ruling in *Megapulse* (and the same circuit's 1998 ruling in *Commercial Drapery Contractors*), it appears that this point from *Ingersoll* never was good law in the D.C. Circuit.[17]

Moreover, even if the "within the terms of the contract" point were good law, this one similarity is not enough to make the present dispute similar to *Ingersoll*. As discussed

---

[17]*LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc) ("One three-judge panel . . . does not have the authority to overrule another three-judge panel of the court.").

above, the D.C. Circuit's second and third reasons given for determining the source of the *Ingersoll* claim to be contractual are not applicable to the present dispute. Also, as discussed above, the *Ingersoll* court ruled that the relief sought was specific performance, a contractual remedy–the relief issue alone is sufficient to distinguish *Ingersoll* from the present case. Finally, the many differences between the present case and *Ingersoll* are quite important–*Ingersoll* itself stressed the case-specific nature of the CDA inquiry. 780 F.2d at 76-77 ("As to whether the relief sought was essentially contractual, the [*Megapulse*] court recognized that the question 'may be resolved only against the facts of each case.' [*Megapulse*, 672 F.2d] at 970.").

The claim for violation of postal regulations is not a claim "relating to a contract," under the CDA, but rather is a claim based upon rights established in government regulations. The claim is analogous to that in *Commercial Drapery Contractors*, where the CDA did not bar jurisdiction over the plaintiffs' claims "that GSA's cancellation and suspension decisions violated multiple government procurement statutes and regulations." 133 F.3d at 3.

This claim should be decided on the merits. If the regulations do not vest any rights in mail transporters, then the district court should grant a motion to dismiss this claim. But if a regulation does vest a right of action in the mail transporters, then the source of this right is the regulation, notwithstanding that a contract issue arises in rebuttal. *Ingersoll* is not controlling, and there is no other valid argument for classifying the rights found in the regulation as contractual.

### 3. Plaintiffs' claim for declaratory and injunctive relief for arbitrary agency action without statutory authority

Plaintiffs' third cause of action is the claim that the Exxon contracts created third-party obligations, obligating Plaintiffs to certain fuel supply provisions, and that because the USPS lacks statutory authority to obligate third parties, such obligations were arbitrary and capricious. Plaintiffs assert that arbitrary and capricious action violates due process. *Tolchin v. Supreme Court*, 111 F.3d 1099, 1115 (3rd Cir. 1997) ("Due process may also be violated if the government acts arbitrarily or capriciously. *Grayned*, 408 U.S. at 109."). Plaintiffs assert irreparable harm.

Nothing in this claim relates to the contractual relationship between Plaintiffs. The claim itself is structured and argued such that it would be the same if, hypothetically, Plaintiffs had no contractual relationship with the USPS: i.e., if, hypothetically, the USPS attempted to obligate all gas stations to give discounts to mail transporters, and gas stations had no contractual relationship with the USPS, then the gas stations could assert the exact same legal rights.

The source of the rights in this claim is not distinguishable from the source of rights in claims over which the CDA did not bar jurisdiction in *Commercial Drapery Contractors*. 133 F.3d at 3 (holding that the CDA did not bar jurisdiction over the plaintiffs' claims "that GSA's cancellation and suspension decisions . . . constituted 'de facto debarment' or 'blacklisting,' thereby depriving them of due process.").

On the merits, contract issues certainly may be relevant: Plaintiffs' contracts with the USPS may be considered in determining disputed factual issues concerning whether Plaintiffs agreed to abide by the Exxon contracts. But the contract issues would arise only in rebuttal, not in setting forth the source of rights upon which Plaintiffs base their

claims. Again, the existence of contract issues as rebuttal points does not change the nature of the source of the rights claimed. *Commercial Drapery Contractors*, 133 F.3d at 4; *Megapulse*, 672 F.2d at 968.

### CONCLUSION

In summary, the "essentially contractual" standard requires analysis of both the source of rights and the relief sought (or appropriate), for each of Plaintiffs' claims. The relief requested is non-contractual, in seeking declaratory and injunctive measures to enforce (1) property rights whose source is found in the title to land, and various claimed liberty rights (with the exception of the right to perform HCR contracts); (2) rights whose source is USPS regulations (if these rights are vested at all), and (3) rights whose source is the due process entitlement to be free from arbitrary and capricious government action that harms Plaintiffs' interests. The only "essentially contractual" claim is the liberty right to perform the HCR contracts–for this claim, the source of the rights claimed and the relief sought are contractual. The district court has jurisdiction over all of the claims in this case except for the claim of liberty to perform HCR contracts.

For the aforementioned reasons, we **REVERSE** the judgment of the district court on all claims, except for the claim for performance of the HCR contracts.

———————

**DISSENT**

———————

COOK, Circuit Judge, dissenting. This appeal concerns the sole issue of which court—the district court or the Court of Federal Claims—has subject matter jurisdiction over the truckers' claims against the United States Postal Service (USPS). If, as USPS argues, the claims are essentially contractual, then the Contract Dispute Act (CDA) governs them and the Court of Federal Claims has exclusive subject matter jurisdiction. 41 U.S.C. §§ 601-13 (governing all contracts that an executive agency enters into for procuring goods and services). But if, as the truckers contend, their claims are based on constitutional and statutory rights, then the district court has subject matter jurisdiction.

The district court concluded that the claims are essentially contractual and granted USPS's motion to dismiss for lack of subject matter jurisdiction. The majority, accepting almost completely the truckers' characterization of their claims as constitutional and regulatory, concludes that the district court has subject matter jurisdiction over most of the claims. Because the district court correctly determined that all of the claims are essentially contractual, I respectfully dissent.

I

The majority proposes that in deciding whether the CDA governs the truckers' claims, the district court should have followed the well-pleaded-complaint rule and based its decision only on the truckers' pleadings, without evaluating any issue USPS raised in defense. But a corollary to the well-pleaded complaint rule—the artful-pleading doctrine—not only allows but requires courts to look beyond the pleadings to ascertain the source of a plaintiff's claims. Although the majority is correct that under the well-pleaded-complaint rule,

federal question jurisdiction exists only if the federal element is part of the plaintiff's claim, *Gully v. First Nat'l Bank*, 299 U.S. 109 (1936), the plaintiff is not free to manipulate jurisdiction by omitting necessary federal elements from its claim. *Rivet v. Regions Bank*, 522 U.S. 470, 475 (1998) ("As a corollary to the well-pleaded defense rule, a plaintiff may not defeat removal by omitting to plead necessary federal questions. If the plaintiff thus 'artfully pleads' a claim, a court may uphold removal even though no federal question appears on the face of the complaint." (citation and internal punctuation omitted))*; Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 13 (1983) (stating that when a plaintiff pleads only state causes of action, "original federal jurisdiction is unavailable *unless* it appears that some substantial, disputed question of federal law is a necessary element of one of the well-pleaded state claims, or that one or the other claim is 'really' one of federal law" (emphasis added)); *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981) (agreeing that removal was proper when "respondents had attempted to avoid removal jurisdiction by 'artful[ly]' casting their 'essentially federal law claims' as state-law claims"). In short, the artful-pleading doctrine requires a court to "look[] past the surface allegations to make its own assessment of what law the claim arises under." *Int'l Armor & Limousine Co. v. Moloney Coachbuilders, Inc.*, 272 F.3d 912, 914 (7th Cir. 2001).

Courts apply the artful pleading doctrine not only in federal question cases but also in a variety of other cases, when plaintiffs attempt to manipulate procedural rules. *See, e.g.*, *Harrow v. Prudential Ins. Co.*, 279 F.3d 244, 253 (3d Cir. 2002) ("Plaintiffs cannot circumvent the exhaustion requirement by artfully pleading benefit claims as breach of fiduciary duty claims."); *Hartz v. Liberty Mut. Ins. Co.*, 269 F.3d 474, 476 (4th Cir. 2001) ("By styling her complaint as one for breach of contract, Hartz attempts to avoid the Maryland bar against tort actions. No amount of artful pleading such as terming the damages 'consequential' can

disguise what Hartz is seeking—extra-contractual damages for additional medical expenses, business losses, and emotional distress."); *Ford v. NYLCare Health Plans*, 141 F.3d 243, 250 (5th Cir. 1998) ("Basing the arbitrability of an action merely on the legal label attached to it would allow artful pleading to dodge arbitration of a dispute otherwise 'arising out of or relating to' (or legally dependent on) the underlying contract."); *Lambert v. Kysar*, 983 F.2d 1110, 1121 (1st Cir. 1993) ("We cannot accept the invitation to reward attempts to evade enforcement of forum selection agreements through artful pleading of tort claims in the context of a contract dispute." (internal punctuation omitted)); *Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 997 (9th Cir. 1987) (finding that the district court "properly looked beyond the face of the complaint to determine whether the contract claim was in fact a section 301 claim for breach of a collective bargaining agreement artfully pleaded to avoid federal jurisdiction"). In a case involving the CDA, the D.C. Circuit Court of Appeals observed, "Courts have not hesitated to look beyond the pleadings of a case brought in district court to determine if it involves a claim over which the Court of Claims has exclusive jurisdiction." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982).

In this case, the majority fails to recognize the truckers' artful pleading of their contract claims as constitutional and regulatory claims; this failure in effect sanctions the truckers' attempts to evade the jurisdictional mandate of the CDA. A proper analysis of the truckers' claims must begin with the understanding that "[t]he plaintiff's title or characterization of its claims is not controlling. . . . Rather, it is the determination of whether the action is essentially a contract dispute that controls." *Campanella*, 137 F.3d at 892 (quoting *RMI Titanium*, 78 F.3d at 1136) (alteration in original). Moreover, "a plaintiff may not avoid the jurisdictional bar of the CDA merely by alleging violations of regulatory or statutory provisions." *RMI Titanium*, 78 F.3d at 1136 (quoting *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C.

Cir. 1985)). Thus, the truckers' characterization of their claims as constitutional and statutory has no bearing on whether the claims *are* contractual. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 377 (2d Cir. 1999) (rejecting plaintiff's "attempts to characterize this action as an APA challenge rather than a contract dispute"); *A & S Council Oil Co. v. Lader*, 56 F.3d 234, 241 (D.C. Cir. 1995) (finding claims were contractual and noting, "It is true that plaintiffs have disavowed the notion that they are making contract claims. Instead, they say, the damages they have suffered flow from unlawful agency action. . . . In any event, plaintiffs' labeling is of little importance.").

Furthermore, in this case the contractual foundation of the truckers' claims is evident from the truckers' pleadings, not just from USPS's "rebuttal points." The truckers' complaint raises the indisputably contractual (as well as dispositive) issue of the validity of the amendments to the truckers' contracts with USPS, alleging that "Plaintiffs were never consulted regarding the terms and conditions of these contracts [between USPS and the fuel suppliers], nor did they consent to be bound thereby" (Second Amended Compl. ¶ 5.4), and that USPS "is attempting to compel Plaintiffs . . . to comply with those contracts without Plaintiffs' permission" (Second Amended Compl. ¶ 8.3).

II

A.  The Fifth Amendment Claims

The truckers argue that by interfering with their right to control their fuel supply, USPS deprived them of their property without due process or just compensation. But whether the truckers have a right to control their fuel supply depends upon whether their *contracts* with USPS afford such a right—in particular, whether the amendments to their contracts validly require the truckers to comply with the fuel plan. As the majority recognizes, "Amendment 3 is the

apparent cause of Plaintiffs' frustration." And while it is true that "Plaintiffs do not seek specific performance of *this* [amended] contract" (emphasis added), they are in effect seeking specific performance of their pre-amendment contracts. The truckers' objection to the contract amendments is the essence of their claims; everything else is a smoke-and-mirrors effort to obscure the claims' contractual nature.

Additionally, if the truckers contend correctly that the contracts do not validly restrict their right to control their fuel supply, and USPS nevertheless has abridged that right, then the proper recourse would be a breach of contract claim, not a takings claim. *See Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1070 (Fed. Cir. 2001) ("[T]he concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." (citations and internal punctuation omitted)).

### B. The Regulatory Claims

The truckers further argue that USPS lacked authority to develop the fuel plan because USPS regulations prohibit USPS from interfering with the operation of its contractors' businesses, and that in the absence of regulatory authority, USPS's insistence that the truckers comply with the fuel plan violates their right to due process. Specifically, the truckers cite two regulations that they contend render the fuel plan invalid: USPS's Purchasing Manual (stating that "[t]he objective of any purchasing action is to meet contract objectives, not control the supplier's business") and its Management Instructions (stating that "[p]urchases of fuel may be made from any source at the option of the contractor").

This argument, however, conflicts with the truckers' position that the amendments to their contracts do not obligate them to purchase fuel from the designated suppliers: the amendments cannot be both contractually invalid (as the truckers contend when arguing that the amendments do not constitute consent to the fuel plan) and contractually valid (as the truckers contend when arguing that the amendments are inconsistent with USPS regulations). If the amendments are contractually invalid and therefore do not compel the truckers to comply with the fuel plan, then the amendments cannot also violate USPS regulations by compelling the truckers to comply with the fuel plan.

This inconsistency, although perfectly acceptable as an alternative-pleading strategy, nevertheless highlights the contractual nature of truckers' claims because their contracts with USPS are at the core of both sides of the truckers' argument. Regardless of whether the truckers argue that USPS's attempts to require them to purchase fuel from the designated suppliers violate the contracts, or that the contracts violate USPS regulations, their claims are contractual. The possibility that USPS's attempts to require the truckers to adhere to the fuel plan might violate USPS regulations does not transform a claim into one that is regulatory and not contractual. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985) ("The question presented by the complaint could be phrased as whether the contract forbids termination under these conditions. That the termination also arguably violates certain other regulations does not transform the action into one based solely on those regulations."). Otherwise, because every government agency is bound to follow some set of regulations, every government contractor could recast its contract claims as regulatory claims, thereby nullifying the CDA. *Cf. United States v. J & E Salvage Co.*, 55 F.3d 985, 988 (4th Cir. 1995) ("Effective enforcement of the jurisdictional limits of the CDA mandates that courts recognize contract actions that are dressed in tort clothing."); *Melanson v. United Air Lines, Inc.*, 931 F.2d 558, 561 n.1

(9th Cir. 1991) ("Nearly any contract claim can be restated as a tort claim. The RLA's grievance procedure would become obsolete if it could be circumscribed by artful pleading.").

### C. Relief Available from the Court of Federal Claims

Finally, the truckers contend that the district court has jurisdiction because the Court of Federal Claims cannot grant the injunctive relief they seek. While the truckers correctly assert that the Court of Federal Claims cannot grant this relief outright, the court can achieve the same result—freedom from compliance with the fuel plan—if the court finds that such a result is appropriate, by granting a contractual remedy such as reforming the truckers' contracts with USPS. *See Ho v. United States*, 49 Fed. Cl. 96, 100 (2001) ("Reformation of a contract is an equitable remedy that may be invoked in this court . . . when the contract contains . . . provisions that are contrary to law." (citing *Am. Tel. & Tel. Co. v. United States*, 177 F.3d 1368, 1376 (Fed. Cir. 1999); *McClure Elec. Constructors, Inc. v. Dalton*, 132 F.3d 709, 711 (Fed. Cir. 1997); *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994))).

### III

Because all of the truckers' claims relate to their contracts with USPS, the CDA governs the claims, and exclusive subject matter jurisdiction therefore lies in the Court of Federal Claims. Thus, I dissent from the majority's decision reversing the district court's dismissal of the truckers' claims for lack of subject matter jurisdiction.